*754
 
 OPINION
 

 Per Curiam:
 

 Appellants and cross-respondents W. Randall Mainor and Richard A. Harris, individually, as professional corporations and as a partnership, appeal from the district court’s entry of final judgment pursuant to a jury verdict against Mainor and Harris. Respondents and cross-appellants Philip Nault and Wendy Nault, as co-guardians of the person and estate of Jason Nault, cross-
 
 *755
 
 appeal from a district court order offsetting the final judgment by $400,000 from a prior settlement with another attorney involved in the underlying case. We conclude that insufficient evidence supports the jury’s verdict and therefore reverse the district court’s judgment.
 

 FACTUAL AND PROCEDURAL HISTORY
 

 Jason Nault, a Southwest Airlines baggage handler, was rendered in a permanent vegetative state after anesthesia equipment failed during his hernia surgery. His pregnant wife, Louise Nault, brought a medical malpractice claim on behalf of herself and Jason. Louise sought the advice of attorney Joe Rolston, for whom she had worked as a secretary. Rolston agreed to assist Louise but advised her that, as medical malpractice was outside of his area of expertise, she should hire an attorney with experience in this area. Louise and Rolston entered into a contingency fee agreement.
 

 After Louise and Rolston interviewed several personal injury attorneys, Louise decided to retain W. Randall Mainor and the law firm of Mainor & Harris. On June 13, 1994, Louise, Mainor and Richard A. Harris signed a contingency fee agreement, which established that Mainor and Harris would receive 33.3 percent of the gross recovery prior to suit and 40 percent after suit was filed. The agreement incorporated the previous retainer agreement with Rolston.
 

 On June 16, 1994, before the family court had granted guardianship of Jason to Louise, Mainor filed a lawsuit on behalf of Jason and Louise, seeking damages for Jason’s injuries and Louise’s loss of consortium. In March 1996, after nearly two years of contentious litigation, the parties participated in a full-day settlement conference during which the mediator valued the case at $6-7 million. The case settled for approximately $17 million.
 

 After settlement, the parties held a meeting to allocate the $17 million. Louise insisted that Jason’s needs were the first priority. Attorney Jamie Chrisman, who represented the workers’ compensation division for Southwest Airlines, was primarily responsible for monitoring Jason’s medical care and medical bills. The estimated cost for all of Jason’s needs, including twenty-four-hour nursing care, physical therapy and all other medical needs, was $20,000 per month. Because die persons attending the meeting desired a large financial cushion for Jason, they decided on payments of $32,000 per month that would automatically increase by 2 percent every year for Jason’s life. They determined to use the settlement proceeds to purchase an annuity for Jason to pay a guaranteed stream of tax-free money. Any remaining settlement money was to be used to provide for Louise and Louise and Jason’s baby, Rene.
 

 
 *756
 
 The attorney fee agreements provided for fees totaling 40 percent of the settlement, or approximately $6.8 million. Southwest Airlines had a workers’ compensation lien on the settlement for approximately $600,000. Jason’s annuity cost $2,503,470 and was expected to pay approximately $39 million if Jason lived a full life expectancy. Louise’s annuity cost $4,081,142.53 and had an expected payout of $24.8 million. Even though Rene had no claim, an annuity was also purchased for her at a cost of $437,348, with payments beginning when Rene reached age eighteen and an expected lifetime payout of $7.4 million. The difference in costs between Jason’s annuity and Louise’s annuity was based on their significantly different life expectancies. The total cost of all three annuities was about $7 million, leaving approximately $2.5 million, which everyone agreed should go to Louise.
 

 On April 11, 1996, Mainor petitioned the district court for approval of the compromise of Jason’s claim. The petition specifically set forth the fact that the defendant would pay a guaranteed amount of $32,000 per month, compounded annually for Jason’s lifetime, with an expected value of approximately $39 million if Jason lived a full life expectancy.
 

 On April 19, 1996, the district court, Judge Lee Gates presiding, held a hearing on the settlement of all claims. The attorneys informed the district court that the total settlement was $17 million and that $7 million would be paid in the form of annuities. The attorneys informed the district court that Jason’s annuity would pay $32,000 per month for the rest of his life and that the amount would provide a cushion of over $100,000 per year for unexpected contingencies. They further informed the district court that Jason’s daughter, Rene, possessed a contingent claim against the defendants in the tort case, and that Rene’s annuity would start paying when Rene turned eighteen, for an estimated $7,494,090 during her lifetime. They informed the district court that the attorney fees charged to Jason’s portion of the settlement would be $1,668,980 and to Rene’s portion would be $291,565.64.
 

 Judge Gates, who had been the trial judge in the underlying tort case, found that the compromise of Jason’s claim and Rene’s contingent claim was fair and reasonable. Accordingly, the district court approved the compromise, as well as the payment of attorney fees.
 

 Three months after the settlement, Louise offered to buy Jason’s parents a new house for $150,000. They preferred a cash gift, but Louise could not gift $150,000 in cash because of tax consequences. However, she did give them $30,000 and another $120,000 for a total of $150,000. She also gave $50,000 to Jason’s brother, Kelly Nault, so that he could attend school to become a physical therapist. She arranged and paid for a ten-day religious
 
 *757
 
 pilgrimage for Jason, which included Jason’s nursing staff, Jason’s family and Louise’s family, to Lourdes, France, totaling $70,000 in travel expenses.
 

 Louise housed Jason from December 1996 to May 1997. At the end of April 1997, Louise asked Wendy and Philip Nault if they could care for Jason in their home, as Louise wished to return to college to finish her degree. On May 3, 1997, Jason began to reside at his parents’ house.
 

 Louise’s relationship with the Naults subsequently deteriorated. They felt that Louise was mismanaging Jason’s estate because several checks to Jason’s nurses had been returned for insufficient funds. In February 1998, the Naults obtained a temporary restraining order against Louise, which prevented her from taking Jason from his parents’ home to visit her home on his birthday. They also brought a successful guardianship action against Louise to obtain control over Jason’s person and estate.
 

 After Louise relinquished guardianship, the Naults released Louise from all other claims. On May 11, 1998, the Naults signed a stipulated settlement agreement, in which they acknowledged the compromise of Jason’s claims in the prior tort action and Louise’s acceptance of the compromise on behalf of Jason, Rene and herself. They also acknowledged that the lump sum payments and annuities had been allocated to Louise, Jason and Rene. Finally, they expressly agreed not to contest the final settlement of the tort action or any other issue relating to the $17 million settlement. On June 9, 1998, the district court entered an order approving the settlement between Louise and the Naults.
 

 As newly appointed guardians, the Naults used Jason’s settlement money for the down payment on a 3,500 square foot home for Jason, but they put title to the house in their own names, allegedly because the mortgage company would not allow them to put the house in Jason’s name due to his poor credit. They also paid themselves a $4,500 monthly salary and $5,000 per month for Jason’s housing.
 

 Soon after settling with Louise, the Naults, as guardians, retained an attorney and on April 8, 1999, commenced the present action against Louise, Rolston, Mainor, Harris and the law firm of Mainor & Harris. The complaint essentially alleged that the attorneys should have recognized that they had a conflict of interest by representing both Jason and Louise, that the attorneys and Louise conspired to deprive Jason of his money and that Jason received insufficient compensation in the settlement.
 

 The Naults settled with Rolston for $400,000. They settled with Louise for no money, in spite of the fact that they alleged that Louise had breached her fiduciary duties to her husband and conspired to obtain a larger portion of the settlement money than
 
 *758
 
 Jason. In the second settlement with Louise, the Naults obtained a divorce for Jason from Louise, Louise withdrew an objection she had filed to the Naults’ guardianship accounting, Louise dismissed a complaint she had filed against Jason’s parents and Kelly Nault to recover large amounts of money she had allegedly loaned to them and Louise renounced any claims she might have had to any money recovered in the present action.
 

 The action proceeded to trial against Mainor and Harris. After a twelve-day trial, the jury awarded $3.25 million to Jason’s estate against Mainor and Harris. The district court’s final judgment offset the jury’s award by $400,000, which reflected Rolston’s settlement with the Naults. Mainor and Harris subsequently moved for a judgment notwithstanding the verdict (JNOV), or alternatively, to modify the judgment to preclude prejudgment interest. After a hearing, the district court denied the motion. Mainor and Harris appeal from the final judgment,
 
 [2]
 
 and the Naults cross-appeal from the order applying an offset to the judgment.
 

 DISCUSSION
 

 Die district court’s jurisdiction
 

 Mainor and Harris assert that the district court lacked jurisdiction over the present action because the district court’s settlement approval order in the medical malpractice action was valid and was never set aside, precluding the present action as an impermissible collateral attack on a final judgment. Because Mainor and Harris’s assertion of collateral estoppel presupposes the existence of a valid prior order, we will first determine whether the district court’s settlement approval order was valid and then we will turn to the merits of the collateral estoppel argument.
 

 The Naults contend that the settlement approval order was void for three reasons: (1) lack of relevant material information, (2) due process violations, and (3) lack of jurisdiction. We will address each argument in turn.
 

 First, the Naults’ assertion that the district court was not aware of the total amount that Louise would receive, or the total attorney fees, is inapposite. This court will not disturb the district court’s
 
 *759
 
 findings of fact if they are supported by substantial evidence.
 
 [3]
 
 The transcript of the settlement approval hearing shows that the district court was informed that $7 million would be used to purchase annuities for Jason, Rene and Louise. Because Jason would receive $32,000 per month for the rest of his life, and Rene would receive a guaranteed sum of $1,942,871 over her lifetime, the district court properly determined that the settlement was fair and reasonable with respect to Jason and Rene. Although there was no mention that Louise would also receive an annuity and a significant lump sum payment, no approval was required for the settlement of Louise’s claim, as she was not a ward under guardianship. Regardless of the amount that Louise would receive, the district court had sufficient information to determine that Jason’s needs were met.
 

 Second, the Naults contend that the settlement approval order was void because it violated Jason’s due process rights.
 
 [4]
 
 They contend that failure to appoint an independent guardian to represent Jason’s interests deprived Jason of procedural due process because of his guardian’s conflict of interest, and the failure to present all material facts to the district court deprived him of substantive due process.
 

 We conclude that this argument lacks merit. First, procedural due process generally is violated when the adjudicator, not the guardian, has a conflict of interest.
 
 [5]
 
 There is no evidence that the district court was biased toward any party.
 

 Second, even if Louise’s guardianship of Jason created a conflict of interest, there was no evidence at the settlement approval hearing that Jason’s needs would not be fully met by the settlement agreement. The substantive due process claim lacks merit because substantive due process concerns the adequacy of the
 
 government’s
 
 reason for depriving a person of life, liberty or property.
 
 [6]
 
 It is not meant to protect against alleged fraud upon the court by private individuals.
 

 
 *760
 
 Third, the Naults assert that the order was void for lack of jurisdiction because, without the appointment of a guardian ad litem for Jason, the family court had exclusive subject matter jurisdiction over Jason’s claims.
 

 NRS 159.093 (1993) provided that:
 

 A guardian of the estate shall demand, sue for and receive all debts and other choses in action due to the ward. A guardian of the estate, with prior approval of the court by order, may compound or compromise any such debt or other chose in action and give a release and discharge to the debtor or other obligor.
 
 [7]
 

 The 1993 version of NRS 159.015 defined “court” as “any court or judge having jurisdiction of the persons and estates of minors, incompetent persons, or persons of limited capacity.” The 1993 version of NRS 3.223 provided, in relevant part, that:
 

 1. In each judicial district in which it is established, the family court has original, exclusive jurisdiction in any proceeding:
 

 (a) brought pursuant to chapter . . . 159 . . . of NRS.
 
 [8]
 

 When read together, it appears that the family court has exclusive jurisdiction over guardianships and that the guardian of the ward’s estate must seek the family court’s approval before agreeing to a settlement on behalf of the ward. Although Mainor and Harris argue that NRS 3.220 gives district courts “equal coextensive and concurrent jurisdiction and power,” NRS 3.220 is more nuanced than Mainor and Harris suggest because it provides that district
 
 judges
 
 have concurrent and coextensive jurisdiction. This allows district judges to preside over proceedings in districts other than their own, but does not give district courts concurrent and coextensive jurisdiction over matters reserved to family courts. Furthermore, the Legislature, by creating family courts and giving them exclusive original jurisdiction over certain matters, removed oversight of guardianships from the district court’s jurisdiction in jurisdictions that have separate family courts.
 

 Louise’s petition for guardianship of Jason made no mention of Jason’s potential claims for medical malpractice. Hence, the guardianship court was not aware that such claims were an asset of Jason’s estate. There is no evidence in the record that Louise ever sought the guardianship court’s approval before agreeing to the set
 
 *761
 
 tlement of Jason’s claims. Hence, at first blush, it appears that the district court lacked subject matter jurisdiction to approve the settlement with respect to Jason.
 
 [9]
 

 However, when evidence before the court provides a colorable case for jurisdiction, a district court order is merely voidable rather than void.
 
 [10]
 
 Here, because the district court had jurisdiction to try to judgment the underlying medical malpractice case and to enter a judgment based upon the verdict, the court must have reasonably believed that it could finalize the global settlement agreed to by all of the parties. No one objected to the district court’s finding that the settlement was fair and reasonable. Moreover, orders of the district court are presumptively valid if regular on their face.
 
 [11]
 
 On its face, the district court’s order appears to be a regular settlement approval order. Hence, the order was voidable, but not void.
 

 The Naults, on Jason’s behalf, never attempted to set aside the judgment pursuant to NRCP 60(b) for fraud, lack of good faith or because the order was allegedly void. Subsequently, on November 15, 2001, in the legal malpractice case, the district court determined that the district court in the medical malpractice action had subject matter jurisdiction under NRS 3.223 and NRS Chapter 159 to approve the settlement. This finding was proper because the Naults never moved to set aside the settlement approval order under NRCP 60(b) and did not contest the global settlement of $17 million. We conclude that the settlement approval order was voidable, but, since the Naults never attempted to set it aside and in fact did not contest approval of the global settlement but only the allocation to Jason, their conduct ratified the order’s validity.
 

 We turn now to the issue of whether the legal malpractice suit constituted an impermissible collateral attack on the order. Mainor and Harris claim that since the district court’s settlement approval order found the allocation to Jason to be fair and reasonable, and since the Naults never moved to set aside that order, the finding that Jason’s portion of the settlement was fair negates any legal malpractice claim. Furthermore, they contend that the district court’s finding demonstrates that Jason was adequately compensated and suffered no damages. Hence, they assert that the Naults’
 
 *762
 
 claims for malpractice, premised on the theory that Jason was not adequately compensated, collaterally attacked the final judgment on the merits.
 
 [12]
 
 Mainor and Harris contend that, since a district court has no legal authority to alter or vacate another district court’s valid judgment or order,
 
 [13]
 
 the district court erred by allowing the malpractice case to proceed in light of the fact that the Naults never tried to set aside the settlement approval order.
 

 While the district court granted Mainor and Harris’s motion for summary judgment in part, the district court partly denied the motion, concluding that the settlement approval order was valid and that, because the Naults were not seeking to modify the settlement amount, NRCP 60(b) did not bar their legal malpractice claim. “This court reviews a summary judgment order de novo.”
 
 [14]
 

 We conclude that, in the instant case, the Naults are precluded from bringing a legal malpractice claim. In
 
 Malfabon v. Garcia,
 
 we held that a former client could sue her attorney for malpractice even after a settlement agreement had been signed.
 
 [15]
 
 However, because the instant case is factually distinguishable from the facts of
 
 Malfabon, Malfabon
 
 does not affect our decision today. First, unique to the present case is the fact that the Naults expressly agreed not to contest the final settlement of the tort action or any other issue relating to the settlement, and that this agreement was approved by the district court. Second, the Naults approved of the
 
 *763
 
 settlement amount and complain only that the division of the proceeds was improper.
 

 This second distinction presents us with a unique situation in which the Naults approve of the total amount of the $17 million settlement secured for all the parties, but dispute the division of those funds, an issue that was the subject of the district court’s settlement approval order and finding that the settlement was made in good faith. Permitting the Naults to pursue an independent action as they have done would be unfair for two reasons. First, the Naults are accepting a portion of the settlement approval that benefits them but are bringing suit to upset the portion they now oppose without attempting to modify the settlement compromise. Second, the distribution of a large amount of the proceeds to Louise is left standing without any attempt to recoup the allegedly excessive amount paid to her. The Naults actually compounded this situation by giving a full release to Louise for what appears to be very little compensation. The net result is that the Naults are suing their attorneys for a portion of the settlement previously approved without taking any action to revise the settlement approval and recoup the amount they claim due from Louise, the party who was allegedly unjustly enriched. We do not believe that this is reasonable or equitable.
 

 We have said many times that equity does not favor a person being unjustly enriched. “ ‘[U]njust enrichment occurs whenever a person has and retains a benefit which in equity and good conscience belongs to another.’ ”
 
 [16]
 
 This is precisely what the Naults claimed in their lawsuit against Mainor and Harris and Louise— that Louise unjustly benefited from an excessive award because Louise and the attorneys acted despite conflicts of interest and therefore breached their fiduciary duties.
 

 Faced with this situation, it was incumbent on the Naults to first move to modify the good-faith settlement approval and attempt to recoup the claimed improper division of the settlement proceeds given to Louise. This procedure would have forced the Naults to first seek relief in the district court that previously approved the settlement and division of proceeds. This action is consistent with res judicata principles that generally preclude an independent action when the grievance could or should have been addressed in a pending matter.
 
 [17]
 
 Indeed, at least one jurisdiction mandates that a
 
 *764
 
 party wishing to challenge the merits of a good-faith settlement must do so prior to the final judgment by seeking writ review in the trial court.
 
 [18]
 
 This procedure encourages settlement because it helps to ensure that settlements will not be attacked after a final judgment is issued. In the instant case, the same policy goals are furthered by requiring the Naults to first seek reapportionment of the settlement, in the court below, before allowing them to recover that amount as damages in a malpractice suit. In the event that the Naults had established their claims before the district court that approved the settlement but could not get full satisfaction of their claim by redistribution of the settlement proceeds, they would then be able to bring an independent action.
 

 Requiring the Naults to proceed in that manner has several benefits. They would go directly to the court where the alleged improper action took place, and they would directly ask the allegedly unjustly enriched party for a portion of the proceeds given to her. This requirement should not limit a plaintiff from attaining full recovery of damages suffered, nor should a plaintiff be required to proceed to set aside the good-faith settlement if it would be a futile act. While the Naults may not have obtained full recoupment from Louise, they would have mitigated their alleged damages, which the law favors.
 
 [19]
 
 An independent suit could then be brought for any additional damage suffered by the Naults. By not proceeding in this way in a timely manner, the Naults have waived their right to an independent action.
 

 Judicial estoppel
 

 Mainor and Harris next argue that the judicial estoppel doctrine precludes the legal malpractice action because the doctrine’s purpose is to suppress fraud and prevent a party from changing his or her position depending on the demands of each particular case concerning the subject matter in controversy.
 
 [20]
 
 Mainor and Harris assert that the Naults cannot pursue the legal malpractice claim because the guardianship settlement agreement the Naults submitted to the district court under oath
 
 [21]
 
 absolved Louise of all claims relating to the medical malpractice case and guardianship. Mainor
 
 *765
 
 and Harris argue that the family court’s approval of the guardianship settlement agreement constituted judicial endorsement of both parties’ positions.
 
 [22]
 
 Mainor and Harris argue that, because the Naults knew that Mainor and Harris represented Louise and Jason in the medical malpractice suit and that Jason, Louise and Rene would receive annuities and cash payments from the $17 million settlement, the Naults’ legal malpractice action was a change of their position from the guardianship action, which was barred by judicial estoppel.
 

 Mainor and Harris brought the issue of judicial estoppel to the district court’s attention in a motion for summary judgment, which the district granted in part and denied in part. Therefore, we conduct de novo review.
 
 [23]
 

 The primary purpose of judicial estoppel is to protect the judiciary’s integrity rather than the litigants.
 
 [24]
 
 The court may invoke the doctrine at its discretion.
 
 [25]
 
 However, “[¡judicial estoppel is an extraordinary remedy” that should be cautiously applied only when “a party’s inconsistent position [arises] from intentional wrongdoing or an attempt to obtain an unfair advantage.”
 
 [26]
 
 Judicial estoppel does not preclude changes in position not intended to sabotage the judicial process.
 
 [27]
 

 Although not all of these elements are always necessary, the doctrine generally applies “when ‘“(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.” ’ ”
 
 [28]
 

 
 *766
 
 Here, the Naults sued Louise for guardianship of Jason. In the course of that litigation, the Naults and Louise entered into a settlement agreement, which provided in part that: “WENDY and PHILIP NAULT shall not contest or seek to set aside the settlement or final resolution of or release of the District Court Action on behalf of JASON NAULT, LOUISE NAULT or RENE ROSE NAULT.” The family court approved this settlement agreement on June 9, 1998, after a hearing. The 1998 version of NRS 159.073 required Wendy and Philip to take an oath before the family court would approve their letters of guardianship. Mainor and Harris argue that this oath, plus the stipulated settlement, constituted an inconsistent position in judicial proceedings that was judicially accepted by the family court’s approval of the settlement agreement.
 

 This argument lacks merit. First, the protection of the judicial system from parties asserting inconsistent positions assumes that the inconsistent position was successfully asserted in a prior judicial proceeding.
 
 [29]
 
 “A settlement neither requires nor implies any judicial endorsement of either party’s claims or theories, and thus a settlement does not provide the prior success necessary for judicial estoppel.’ ’
 
 [30]
 
 Because the district court or jury does not determine the facts when a settlement agreement is presented to the court, it does not constitute a judicial endorsement of a party’s claims, even in a situation such as this, where the family court’s approval was required. The family court’s approval only assured that Jason’s interests were not compromised by the settlement agreement. Furthermore, the mere fact that the Naults knew that Mainor, Harris and Rolston were the attorneys in the medical malpractice claim did not make the attorneys a beneficiary of the settlement agreement because the settlement did not contemplate releasing the attorneys from any liability for alleged legal malpractice. While Louise might have been able to assert the settlement agreement as a defense to the legal malpractice, conspiracy and breach of fiduciary claims, the attorneys could not. Finally, Mainor and Harris’s argument that the Naults essentially sought to modify the medical malpractice settlement in their legal malpractice claim hinges on the attorneys’ characterization of the Naults’ claim as an attempt to redistribute the medical malpractice settlement proceeds. This characterization is wrong because a legal malpractice claim focuses on whether the attorneys adhered to the standard of care in their representation of the case, which is different from the underlying medical malpractice claim.
 

 
 *767
 

 Admission into evidence of specific ethical
 
 rules
 
 [31]
 

 Mainor and Harris contend that the district court, upon Mainor and Harris’s motion, dismissed all causes of action based upon alleged violations of specific rules of professional conduct, but subsequently denied Mainor and Harris’s motion in limine to preclude evidence of the professional rules. Mainor and Harris contend that the district court erroneously instructed the jury on specific professional rules, over their objection, because an alleged violation of the rules of professional conduct does not create a civil cause of action, as set forth in the preamble to the American Bar Association Model Rules, which may be used for guidance in applying the Nevada rules.
 
 [32]
 
 Mainor and Harris assert that while this court has never addressed the issue, other jurisdictions have excluded expert opinion testimony and evidence because the rules were not intended to create a private right of action but a public remedy by disciplinary action;
 
 [33]
 
 that the rules are not statutes or regulations but court-promulgated rules; and that the standards for legal malpractice are well-established by common law. Mainor and Harris contend that once the jury heard these rules and opinions regarding violations of the rules, it would have been virtually impossible for the jury to decide the case based on the appropriate standard of whether an attorney failed to use the skill, prudence and diligence that a lawyer of ordinary skill and capacity would have used. Mainor and Harris assert that this error entitles them to a new trial. We disagree.
 

 Whether the rules establishing professional legal conduct are admissible to ascertain the standard of care and whether the jury may be instructed regarding the professional rules of conduct are issues of first impression. This court ‘ ‘will only reverse a district court’s decision to admit expert testimony on a showing of a clear abuse of discretion.”
 
 [34]
 
 We have previously recognized that where the breach of the standard of care is not so obvious that negligence can be determined as a matter of law, “expert evidence is generally required in a legal malpractice case to establish the attorney’s breach
 
 *768
 
 of care.”
 
 [35]
 
 We review an allegedly erroneous jury instruction for prejudicial error in light of the evidence.
 
 [36]
 

 At least one jurisdiction has held that a violation of a professional rule creates a rebuttable presumption of negligence.
 
 [37]
 
 Other jurisdictions have held that professional rules are inadmissible in a legal malpractice claim.
 
 [38]
 
 The majority of jurisdictions, however, hold that the violation of professional rules of responsibility does not create a private right of action, but is relevant to the standard of care.
 
 [39]
 

 
 *769
 
 We choose to adopt the majority rule, as it is the better reasoned rule. Because the Nevada Supreme Court Rules reflect a professional consensus of the standards of care below which an attorney’s conduct should not fall, it would be illogical to exclude evidence of the professional rules in establishing the standard of care. The district court appropriately struck the causes of action based on violations of ethical rules because the rules were not meant to create a cause of action for civil damages. However, the district court did not abuse its discretion by allowing the Naults’ standard of care expert witnesses to base their opinions upon the Supreme Court Rules because the rules served merely as evidence of the standard of care, not as a basis for per se negligence.
 

 Furthermore, we conclude that the district court did not err by instructing the jury that “[a]n attorney who represents conflicting interests, without the informed consent of all affected clients, violates a rule of professional conduct applicable to lawyers who practice in Nevada.” The instruction went on to state that “[a] violation of a rule of professional conduct does not establish an act of legal malpractice. It is merely evidence that you may consider in your determination of whether the defendants committed legal malpractice.” A party is entitled to an instruction that is consistent with his theory of the case, is supported by the evidence and is in conformance with existing law.
 
 [40]
 
 The instruction reflected the law in the majority view and properly informed the jury that a violation of a rule of professional conduct alone could not serve as a basis for civil liability. Hence, we conclude that the district court properly instructed the jury.
 

 Jason Nault’s presence in the courtroom
 

 Mainor and Harris contend that the district court improperly denied their motion in limine seeking to exclude Jason’s presence
 
 *770
 
 during trial because Jason’s presence created unfair prejudice.
 
 [41]
 
 Mainor and Harris contend that Jason’s presence was unhelpful to the jury’s determination of the facts and was intended solely to generate tremendous sympathy for Jason and his parents and undermine Mainor and Harris’s right to a fair trial.
 
 [42]
 

 This court has never addressed whether the prejudicial effect of the jury venire’s view of the real party in interest outweighs the real party in interest’s right to be present at the proceedings. Other courts have reviewed this issue for an abuse of discretion.
 
 [43]
 

 The few jurisdictions that have reviewed this issue are divided on the issue of whether a plaintiff has the right to be present at his own trial. In most of the cases that have considered the issue, the trial was bifurcated into liability and damages phases, and the appellate courts concluded that the plaintiff could properly be excluded from the liability phase if his condition was so sympathetic that the other party’s right to a fair trial would have been unfairly prejudiced.
 
 [44]
 
 In
 
 Helminski v. Ayerst Laboratories, A Division of American Home Products Corporation,
 
 the Sixth Circuit Court of Appeals concluded that the exclusion of a plaintiff who could comprehend and aid counsel based merely on his or her physical appearance violated federal due process, but that the exclusion from the liability phase of a litigant unable to comprehend trial proceedings or aid counsel changed the focus from the litigant’s physical and mental condition to the effect of such condition on the jury.
 
 [45]
 
 The Sixth Circuit set forth a two-part test to determine whether a plaintiff should be excluded from his own trial. First, the party seeking exclusion must show that the other party’s presence would be so prejudicial that it would prevent the jury from performing its duty.
 
 [46]
 
 Second, if the court determines that the party’s presence would be prejudicial, the court must determine whether
 
 *771
 
 the party can understand the proceedings and assist counsel.
 
 [47]
 
 The Sixth Circuit determined that, “[i]f the court in its discretion determines that the party’s presence would, indeed, be prejudicial, the court may bifurcate the proceedings into separate trials on liability and damages, excluding the litigant from the liability phase.”
 
 [48]
 
 The court further noted that exclusion of a party from the damages portion of the proceedings would be improper because, while liability should not be premised on the severity of the injuries, damages certainly should be.
 
 [49]
 
 The court also noted, however, that “if the injury is not due to the defendant’s alleged conduct, there is no basis for exclusion.”
 
 [50]
 

 In
 
 Morley v. Superior Court of Arizona, Etc.,
 
 the Supreme Court of Arizona held that the trial court did not abuse its discretion by severing the liability and damages phases of a personal injury action in which the injured party was in a permanent vegetative state because the two issues were separable and because severance would avoid undue prejudice where the injured party was excluded from the liability phase but not the damages phase.
 
 [51]
 
 The Arizona court determined that a plaintiff could properly be excluded from the liability phase if his injuries rendered him incapable of contributing to or understanding the proceedings and if the plaintiff was adequately represented by counsel.
 
 [52]
 
 The court concluded that exclusion from the liability phase would be necessary if the plaintiff’s mere presence would deny the defendant’s right to an unbiased jury, but that “[t]he plaintiff should be allowed to prove damages by the most direct evidence available — the plaintiff’s own physical condition.”
 
 [53]
 

 The Supreme Court of Indiana, however, has held that an injured plaintiff who was rendered incapable of understanding the legal proceedings or assisting counsel had the right to be present at both the liability and damages phases under the Indiana Constitution.
 
 [54]
 
 The court stated that:
 

 After examining the historical development of the right to trial by jury and, in particular, its importance to the founders of this country, we agree with those jurisdictions that have held that the state constitutional right of trial by jury includes the ancillary right to be present in the courtroom during both
 
 *772
 
 the liability and damage phase of trial. This is so because without the right to be present, the right to trial by jury becomes meaningless.
 
 [55]
 

 The record reflects that the Naults sought to have Jason present during jury selection and closing arguments. Mainor and Harris sought to exclude Jason’s presence entirely. At a hearing on Mainor and Harris’s motion in limine, the district court ruled that Jason would be allowed to be present during jury selection but not during closing arguments. We conclude that the district court did not abuse its discretion by allowing Jason to be present during the jury selection.
 

 Article 1, Section 3 of the Nevada Constitution provides, in relevant part, that “[t]he right of trial by Jury shall be secured to all and remain inviolate forever.” Both Article 1, Section 8(5) of the Nevada Constitution and the Fifth Amendment of the United States Constitution prohibit deprivation of “life, liberty, or property, without due process of law.’ ’
 

 A party’s right to be present at his trial is not absolute but rather must be balanced against the opposing party’s right to an impartial jury. Where the party’s presence might elicit so much sympathy from the jury that the jury would likely disregard its duties as instructed and find for the party based on sympathy alone, the opposing party’s right to a fair tribunal would be violated. We generally approve and adopt with one modification the approach set forth in
 
 Helminski
 
 because it properly balances the parties’ respective rights.
 
 [56]
 
 We believe that a party should be permitted to attend his or her trial, or every segment of it if the trial is bifurcated, even though that attendance is very limited.
 

 After a hearing on the matter, the district court in this case concluded that Jason had a right to be present during jury selection, but his presence during closing arguments would only serve to engender sympathy with the jury. The district court did not abuse its discretion. First, Jason was only present for approximately ten minutes during one and one-half days of jury selection. Second, Mainor and Harris did not seek to bifurcate the trial under the
 
 Helminski
 
 test, and the issues were so intertwined that it would have been nearly impossible to bifurcate the trial. Moreover,
 
 *773
 
 Mainor and Harris did not cause Jason’s condition, and, arguably, Jason’s involuntary exclusion would have been improper because his physical condition was not related to Mainor and Harris’s conduct, and the jury could appreciate that fact.
 
 [57]
 
 Third, the Naults played a videotape, without objection, of a day in Jason’s life that depicted Jason shortly after the injury, when his condition was much worse. Because the videotape was likely to engender far more sympathy than seeing Jason in his current condition, Mainor and Harris waived any claims of prejudice by failing to object to the videotape.
 
 [58]
 
 Fourth, the opportunity to see Jason was relevant to Mainor and Harris’s claim that Jason was likely to die soon. The difference between Jason’s condition just after the incident and his current condition was relevant to show that Jason’s condition had improved and that he could live much longer than initially expected. Finally, jury sympathy alone is insufficient to constitute prejudice; there must exist a likelihood that the jury will disregard its duty to follow the law as instructed and will find for the injured party solely because of his injury.
 
 [59]
 

 Sufficiency of the evidence regarding damages
 

 Mainor and Harris assert that there was no legal or evidentiary basis for the jury’s determination that Jason was entitled to a larger share of the settlement proceeds because the Naults failed to show proximate causation. Mainor’s efforts resulted in a $17 million settlement, which provided Jason with more than enough to meet his needs for the rest of his life. Mainor and Harris assert that, while Jason’s life expectancy had changed since the time of the settlement, it was still very short and there was no evidence that his annuity was insufficient to meet his needs.
 

 This court will overturn a jury verdict if substantial evidence does not support it, assuming that “ ‘the jury believed the evidence favorable to [the prevailing party] and made all reasonable inferences in [that party’s] favor.’ ”
 
 [60]
 

 
 *774
 
 The required elements of a legal malpractice claim are: (1) an attorney-client relationship; (2) a duty owed to the client by the attorney to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity possess in exercising and performing the tasks which they undertake; (3) a breach of that duty; (4) the breach being the proximate cause of the client’s damages; and (5) actual loss or damage resulting from the negligence.
 
 [61]
 

 Mainor and Harris contend that the evidence regarding damages was too speculative to constitute substantial evidence to support the jury’s $3.25 million verdict against them. We agree. Mainor and Harris objected, by a motion in limine, to testimony that Jason should have recovered 80 percent of the total settlement, as speculative and lacking foundation. Mainor and Harris also objected at trial to testimony that Jason’s annuity would fall short of his medical expenses thirty-five years in the future. The district court admitted the testimony over Mainor and Harris’s objections. Although Mainor and Harris do not specifically raise on appeal the admissibility of that evidence, the error is apparent on the record, and we may “take cognizance of plain error
 
 sua sponte.”
 

 [62]
 

 The record reveals that one of the Naults’ expert witnesses, an attorney from New York State, testified that Jason should have received 80 percent of the global settlement. At trial, in the presence of the jury, the expert discussed this court’s decision in
 
 General Electric Co. v.
 
 Bush.
 
 [63]
 
 The expert informed the jury that, in
 
 Bush,
 
 the jury awarded the injured husband, whose condition was virtually identical to Jason’s, $3,000,000 and awarded the wife $500,000 for her loss of consortium claim. The expert informed the jury that the wife’s award in
 
 Bush
 
 equated to 14 percent of the verdict. In the present case, however, Jason received only 14 percent of the settlement. The expert therefore testified that the current division of the settlement was unreasonable and that Jason, as the injured party, should have received 80 percent of the global settlement.
 

 We believe that the expert’s reliance on
 
 Bush
 
 is misplaced. We determined in
 
 Bush
 
 that the injured party’s wife was entitled to a separate award for loss of consortium and that it did not amount to a “double recovery.” Nowhere in our opinion in
 
 Bush,
 
 do we com
 
 *775
 
 pare the wife’s award with her husband’s, nor did we approve any formula ratio between the two. Therefore, we believe that the expert’s reliance on
 
 Bush
 
 was inappropriate and his discussion of the case during trial was misleading.
 

 We also believe that this testimony was highly speculative and lacked foundation in that it was not based on any treatise of law or on Nevada law regarding apportionment of settlement proceeds between an injured spouse and his wife. Furthermore, testimony indicated that, at the time of the medical equipment failure and when the settlement sum was allocated, Jason was not expected to live very long. One doctor predicted that Jason would survive for one year at most. Based on this information, the attorneys, in allocating the settlement proceeds, did not anticipate that Jason could have lived as long as he has, much less that he might live thirty-five more years. Although another expert witness testified that Jason’s medical needs thirty-five years in the future would significantly exceed his monthly annuity, the attorneys’ and Louise’s decision to purchase an annuity that could potentially fall short of expenses thirty-five years from the date of Jason’s injury should not be evaluated with the benefit of 20/20 hindsight
 
 [64]
 
 that Jason would live much longer than the doctors expected. Nor was it unreasonable for the attorneys to rely upon the doctors’ predictions.
 

 Jamie Chrisman, the attorney who had represented Southwest Airlines in the medical malpractice action, testified that he monitored Jason’s care and medical expenses during the medical malpractice suit. Chrisman testified that it was he who hired experts to determine Jason’s future medical costs if he were to receive the best care that was available. According to Chrisman, the settlement exceeded their target by more than three times, as they had hoped for a $5 million settlement. Chrisman also testified that the attorneys worked to achieve Louise’s goal of having some start-up funds to buy a house, modify it for a disabled person and purchase necessary medical equipment for Jason.
 

 Additionally, trial testimony established that Jason’s annuity was not taxable. The evidence also showed that the approximately $2.5 million lump sum payment to Louise was not taxable, but, if it had been paid to Jason, approximately $800,000 would have been taken as tax.
 

 Furthermore, Wendy Nault, Jason’s mother and co-guardian, conceded that, although little was left over per month from Jason’s annuity, all of Jason’s needs had been met by his annuity. She also
 
 *776
 
 admitted that she and her husband bought a new house for Jason using his annuity, but took title in their names, and that they pay $5,000 per month on the mortgage from his annuity. Wendy admitted that the family court subsequently ordered them to convey title to the real property to Jason. She also testified that they had added a pool and jacuzzi to the house, upon the recommendation of Jason’s physical therapist, out of Jason’s annuity. Wendy further testified that, initially, she and her husband paid themselves $4,500 per month from Jason’s annuity as a case management fee, but that the family court had ordered them to reduce that fee to $1,500 per month as of January 2001.
 

 We conclude that the district court erroneously admitted the speculative damages testimony and, therefore, no substantial evidence supports the jury’s finding that Jason, through his guardians, met his burden of proof with regard to the damages element of his legal malpractice claim.
 

 The Naults ’ claims on cross-appeal
 

 The Naults contend that the district court erroneously reduced the $3.25 million judgment by the $400,000 settlement. Because the record reveals insufficient evidence to support the damages element of the Nault’s suit, we need not address this issue. Next, without citing any legal authority, the Naults assert that, because of the blatant conflict of interest, this court may take judicial notice that neither the district court nor the family court would have approved the apportionment of the settlement proceeds that provided Jason with 14 percent of the gross proceeds, Louise with 38 percent and appellants with 40 percent. The Naults contend that Mainor and Harris drafted an agreement and obtained Louise’s signature thereon, stating that Louise agreed to pay appellants 40 percent of the gross settlement proceeds, irrespective of whether the district court reduced the attorney fees allowed to appellants. In so doing, the Naults argue that Mainor and Harris sought to circumvent any subsequent court order which would reduce their legal fees by implementing an unethical scheme and requiring their client to become an accomplice to that conspiracy. The Naults argue that this conduct prejudiced the administration of justice, thereby violating SCR 203(4). The Naults contend, therefore, that this court should order the appellants to forfeit the entire sum of $1,668,980 that the district court awarded to them for representing Jason’s interests.
 

 As Mainor and Harris counter, the law abhors a forfeiture.
 
 [65]
 
 Furthermore, the Naults’ complaint did not contain a cause of action seeking forfeiture of fees. The district court rejected the
 
 *777
 
 Naults’ request for a jury instruction on forfeiture, but the Naults do not appeal the rejection of their instruction. Had they done so, the correct remedy by this court, in any event and assuming for a moment the correctness of the Naults’ broader assertion, would have been a reversal and remand for a new trial with correct jury instructions, not a determination that they are entitled to forfeiture as a matter of law. Because the Naults fail to provide any supporting authority for the argument that this court may take judicial notice of the egregiousness of Mainor and Harris’s conduct and order forfeiture of their attorney fees, this court need not address the Naults’ argument.
 
 [66]
 

 CONCLUSION
 

 Because we conclude that substantial evidence does not support the damages element of the legal malpractice claim, we reverse the district court’s judgment.
 

 [2]
 

 Although Mainor and Harris also purport to appeal from the denial of their post-judgment JNOV motion, “no appeal may be taken from an order denying a post-judgment motion for judgment notwithstanding the verdict.”
 
 Dow Chemical Co. v. Mahlum,
 
 114 Nev. 1468, 1475 n.1, 970 P.2d 98, 103 n.1 (1998),
 
 holding disfavored on other grounds in GES, Inc. v. Corbitt,
 
 117 Nev. 265, 271, 21 P.3d 11, 15 (2001).
 

 [3]
 

 Keife v. Logan,
 
 119 Nev. 372, 374, 75 P.3d 357, 359 (2003).
 

 [4]
 

 See Watts
 
 v.
 
 Pinckney,
 
 752 F.2d 406, 409 (9th Cir. 1985) (noting that a judgment is void if its entry failed to comply with due process).
 

 [5]
 

 See, e.g., Marshall v. Jerrico, Inc.,
 
 446 U.S. 238, 242 (1980);
 
 Ward
 
 v.
 
 Village of Monroeville,
 
 409 U.S. 57, 60 (1972);
 
 In re Ross, 99
 
 Nev. 1, 9, 656 P.2d 832, 836-37 (1983);
 
 Burleigh
 
 v.
 
 State Bar of Nevada,
 
 98 Nev. 140, 144-45, 643 P.2d 1201, 1203-04 (1982).
 

 [6]
 

 Erwin Chemerinsky,
 
 Constitutional Law Principles and Policies
 
 420 (Richard A. Epstein et al. eds., 1997).
 

 [7]
 

 The current form of the statute has not changed significantly since 1993.
 

 [8]
 

 The current form of NRS 3.223 has not changed significantly.
 

 [9]
 

 Lack of subject matter jurisdiction can be raised at any time during the proceedings and is not waivable.
 
 Swan v. Swan,
 
 106 Nev. 464, 469, 796 P.2d 221, 224 (1990).
 

 [10]
 

 Vaile v. Dist. Ct.,
 
 118 Nev. 262, 272, 44 P.3d 506, 512-13 (2002).
 

 [11]
 

 Charmicor;
 
 Inc.
 
 v.
 
 Bradshaw Finance Co.,
 
 92 Nev. 310, 313, 550 P.2d 413 , 415 (1976).
 

 [12]
 

 See Greene v. Dist. Ct.,
 
 115 Nev. 391, 395, 990 P.2d 184, 186 (1999) (“Undermining the finality of judgments would have serious repercussions for appellate jurisdiction. Our rules of appellate procedure rely on the existence of a final judgment as an unequivocal substantive basis for our jurisdiction, and measure important jurisdictional deadlines from the notice of entry of final judgment”).
 

 [13]
 

 State Engineer v. Sustacha,
 
 108 Nev. 223, 226 & n.3, 826 P.2d 959, 961 & n.3 (1992) (stating that “the district courts have appellate jurisdiction only in cases arising injustices’ courts and ‘other inferior tribunals’ ” but noting that a district court may review a collateral attack on a judgment if the judgment was void for lack of subject matter or personal jurisdiction (quoting Nev. Const, art. 6, § 6)).
 

 [14]
 

 Consolidated Generator v. Cummins Engine,
 
 114 Nev. 1304, 1308, 971 P.2d 1251, 1254 (1998). The district court did not certify the order granting in part and denying in part the motion for summary judgment as final under NRCP 54(b). Hence, it constituted an unappealable interlocutory order, which this court may now review.
 
 Consolidated Generator,
 
 114 Nev. at 1312, 971 P.2d at 1256 (stating that “[although these orders are not independently ap-pealable, since [the appellant] is appealing from a final judgment the interlocutory orders entered prior to the final judgment may properly be heard by this court”).
 

 [15]
 

 111 Nev. 793, 798, 898 P.2d 107, 110 (1995).
 

 [16]
 

 Coury v. Robison,
 
 115 Nev. 84, 90, 976 P.2d 518, 521 (1999) (quoting
 
 Nevada Industrial Dev. v. Benedetti,
 
 103 Nev. 360, 363 n.2, 741 P.2d 802, 804 n.2 (1987)).
 

 [17]
 

 See Pickett
 
 v.
 
 Comanche Construction, Inc.,
 
 108 Nev. 422, 426-427, 836 P.2d 42, 45 (1992).
 

 [18]
 

 Main Fiber Products v. Morgan & Franz,
 
 87 Cal. Rptr. 2d 108, 111-12 (Ct. App. 1999).
 

 [19]
 

 Conner v. Southern Nevada Paving,
 
 103 Nev. 353, 355, 741 P.2d 800, 801 (1987);
 
 Automatic Merchandisers, Inc. v. Ward,
 
 98 Nev. 282, 284, 646 P.2d 553, 554 (1982).
 

 [20]
 

 Breliant
 
 v.
 
 Preferred Equities Corp.,
 
 112 Nev 663, 668-69, 918 P.2d 314, 317-18 (1996);
 
 Sterling Builders, Inc.
 
 v.
 
 Fuhrman,
 
 80 Nev. 543, 550, 396 P.2d 850, 854 (1964).
 

 [21]
 

 NRS 159.073 (1998).
 

 [22]
 

 See Reynolds
 
 v.
 
 C.I.R.,
 
 861 F.2d 469, 473 (6th Cir. 1988) (holding that the bankruptcy court’s approval of a prior settlement between the IRS and the taxpayer constituted judicial acceptance of a party’s position, which judicially estopped the IRS from changing its position and attempting to impose liability on the taxpayer’s husband).
 

 [23]
 

 Consolidated Generator,
 
 114 Nev. at 1308, 971 P.2d at 1254.
 

 [24]
 

 Drain
 
 v.
 
 Betz Laboratories, Inc.,
 
 81 Cal. Rptr. 2d 864, 867 (Ct. App. 1999).
 

 [25]
 

 New Hampshire v. Maine,
 
 532 U.S. 742, 750 (2001).
 

 [26]
 

 Kitty-Anne Music Co. v. Swan,
 
 4 Cal. Rptr. 3d 796, 800 (Ct. App. 2003).
 

 [27]
 

 See U.S. v. Real Property Located at Incline Village,
 
 976 F. Supp. 1327, 1340 (D. Nev. 1997);
 
 Breliant,
 
 112 Nev. at 669, 918 P.2d at 318.
 

 [28]
 

 Furia
 
 v.
 
 Helm,
 
 4 Cal. Rptr. 3d 357, 368 (Ct. App. 2003) (quoting
 
 Thomas
 
 v.
 
 Gordon,
 
 102 Cal. Rptr. 2d 28, 32 (Ct. App. 2000) (quoting
 
 Drain,
 
 81 Cal. Rptr. 2d at 868 (quoting
 
 Jackson v. County of Los Angeles,
 
 70 Cal. Rptr. 2d 96, 103 (Ct. App. 1997)))).
 

 [29]
 

 New Hampshire,
 
 532 U.S. at 750-51;
 
 Breliant,
 
 112 Nev. at 669, 918 P.2d at 318.
 

 [30]
 

 Konstantinidis v. Chen,
 
 626 F.2d 933, 939 (D.C. Cir. 1980).
 

 [31]
 

 The Naults also claim that Mainor and Harris should have obtained a separate guardian ad litem to protect Jason’s interest because Jason and Louise allegedly had a conflict of interest. We determine this issue is without merit and, in any event, would not be dispositive of the issues, and therefore, we need not address it here.
 

 [32]
 

 Cronin v. District Court,
 
 105 Nev. 635 , 639-40, 781 P.2d 1150, 1153 (1989).
 

 [33]
 

 Ex parte Toler,
 
 710 So. 2d 415, 416 (Ala. 1998);
 
 Orsini v. Larry Moyer Trucking, Inc.,
 
 833 S.W.2d 366, 369 (Ark. 1992);
 
 Hizey
 
 v.
 
 Carpenter,
 
 830 P.2d 646, 653-54 (Wash. 1992).
 

 [34]
 

 Krause Inc. v. Little,
 
 117 Nev. 929, 934, 34 P.3d 566, 569 (2001).
 

 [35]
 

 Allyn
 
 v.
 
 McDonald,
 
 112 Nev. 68, 71, 910 P.2d 263, 266 (1996).
 

 [36]
 

 See Pfister v. Shelton,
 
 69 Nev. 309, 310, 250 P.2d 239, 239 (1952).
 

 [37]
 

 Hart v. Comerica Bank,
 
 957 F. Supp. 958, 981 (E.D. Mich. 1997).
 

 [38]
 

 Ex parte Toler,
 
 710 So. 2d at 416 (holding that “the trial judge properly held that evidence of a violation of the Rules of Professional Conduct could not be used in a legal malpractice action”);
 
 Orsini,
 
 833 S.W.2d at 369 (holding that the lower court did not err by refusing to admit into evidence the Model Rules of Professional Conduct because such rules were meant as guidelines only, not to establish a civil cause of action for malpractice);
 
 Webster v. Powell,
 
 391 S.E.2d 204, 208 (N.C. Ct. App. 1990) (holding that the trial court properly excluded evidence of a breach of a rule of professional conduct because such breach is not a basis for civil liability and, therefore, was irrelevant to the malpractice claim);
 
 Hizey,
 
 830 P.2d at 652-54 (holding that the trier of fact may not be informed of rules of professional conduct, either through jury instructions or expert testimony, because the rules were judicially created, rather than legislatively created, were merely guidelines, and provided an ethical standard distinct from the civil standard).
 

 [39]
 

 See, e.g., Sears, Roebuck & Co. v. Goldstone & Sudalter,
 
 128 F.3d 10, 19 (1st Cir. 1997) (stating that, under Massachusetts law, “[violations of the rules governing the legal profession are evidence of legal malpractice”);
 
 Universal Mfg. Co. v. Gardner, Carton & Douglas,
 
 207 F. Supp. 2d 830, 832-33 (N.D. Ill. 2002) (stating that, while an alleged violation of ethical rules does not by itself give rise to a claim for malpractice under Illinois law, “the rules of professional conduct may be relevant to determining the standard of care in a legal malpractice claim”);
 
 RTC Mortg. Trust 1994 N-1
 
 v.
 
 Fidelity Nat. Title,
 
 58 F. Supp. 2d 503, 525 (D.N.J. 1999) (noting that, under New Jersey law, a violation of the rules of professional conduct precluding conflict of interests could be considered as evidence of malpractice);
 
 Elliott v. Videan,
 
 791 P.2d 639, 642 (Ariz. Ct. App. 1989) (holding that the jury was properly instructed regarding professional rules of conduct, with an instruction that die rules were merely evidence that could be considered in deciding whether the attorney committed malpractice);
 
 Allen v. Lefkoff, Duncan, Grimes & Dermer, P.C.,
 
 453 S.E.2d 719, 720-21 (Ga. 1995) (noting that the rales of professional conduct were relevant to the standard of care because “it would not be logical or reasonable to say that the Bar Rules, in general, do not play a role in shaping the ‘care and skill’ ordinarily exercised by attorneys practicing law in Georgia”);
 
 Krischbaum v. Dillon,
 
 567 N.E.2d 1291, 1301 (Ohio 1991) (concluding that the norms of behavior codified in the rales of professional conduct were relevant to what a reasonable attorney would have done and, therefore, were admissible);
 
 DiLuglio
 
 v.
 
 Providence Auto Body, Inc.,
 
 755 A.2d 757, 772 n.16 (R.I. 2000) (“Even though violations of the rales of professional conduct cannot be used to establish a cause of action or to create any presumption that a legal duty has been breached, the violation of a profes
 
 *769
 
 sional rule may be relevant in determining whether a client may void a transaction on the grounds that the lawyer breached his fiduciary responsibilities.”);
 
 Roy
 
 v.
 
 Diamond,
 
 16 S.W.3d 783, 790-91 (Tenn. Ct. App. 1999) (concluding that, although professional rules of conduct do not provide a cause of action for civil liability, they were relevant evidence in determining the standard of care);
 
 Two Thirty Nine Joint Venture
 
 v.
 
 Joe,
 
 60 S.W.3d 896, 905 (Tex. App. 2001) (concluding that the trier of feet could consider a rule of professional conduct in determining the standard of care because the rules reflected a professional consensus of standards below which an attorney’s conduct should not fall and, therefore, “[b]arring the use of the code and denying that the code is relevant to the duties a lawyer has to his client is not logical and would require the re-creation of a standard of care without reference to verifiable or pre-existing rules of conduct”).
 

 [40]
 

 Beattie
 
 v.
 
 Thomas,
 
 99 Nev. 579, 583, 668 P.2d 268, 271 (1983).
 

 [41]
 

 See Morley
 
 v.
 
 Superior Court of Arizona, Etc.,
 
 638 P.2d 1331, 1334 (Ariz. 1981) (concluding that, in the liability phase of a trial, the defendant’s right to an unbiased jury might be prejudiced if the plaintiff’s physical condition “is so pitiable that the trial court determines the plaintiff’s mere presence would prejudice the jury”);
 
 see also Green
 
 v.
 
 North Arundel Hospital,
 
 730 A.2d 221, 235-36 (Md. Ct. Spec. App. 1999);
 
 Bremner By and Through Bremner v. Charles,
 
 821 P.2d 1080, 1084, 1086 (Or. 1991).
 

 [42]
 

 The Naults counter that excluding Jason would have violated the Americans with Disabilities Act. The Naults did not raise this issue before the district court. We need not address an issue raised for the first time on appeal.
 
 Hampe v. Foote,
 
 118 Nev. 405, 409 n.10, 47 P.3d 438, 440 n.10 (2002).
 

 [43]
 

 Helminski v. Ayerst Lab., A Div. of A.H.P.C.,
 
 766 F.2d 208 (6th Cir. 1985);
 
 Bremner,
 
 821 P.2d at 1086.
 

 [44]
 

 Morley,
 
 638 P.2d at 1334;
 
 Green,
 
 730 A.2d at 235-36;
 
 Bremner,
 
 821 P.2d at 1084, 1086.
 

 [45]
 

 766 F.2d at 217.
 

 [46]
 

 Id.
 

 [47]
 

 Id.
 
 at 218.
 

 [48]
 

 Id.
 
 at 217.
 

 [49]
 

 Id.
 
 at 217-18.
 

 [50]
 

 Id. at 215 n.7.
 

 [51]
 

 638 P.2d at 1333.
 

 [52]
 

 Id.
 
 at 1334.
 

 [53]
 

 Id.
 

 [54]
 

 Jordan ex rel. Jordan v. Deery,
 
 778 N.E.2d 1264, 1271-72 (Ind. 2002).
 

 [55]
 

 Id.
 

 [56]
 

 The
 
 Helminski
 
 test was established before Congress enacted the Americans with Disabilities Act of 1990. However, the weight of authority suggests that the
 
 Helminski
 
 test has survived enactment of the ADA.
 
 Jordan,
 
 778 N.E.2d at 1267.
 

 [57]
 

 See Helminski,
 
 766 F.2d at 215 n.7.
 

 [58]
 

 Allum
 
 v.
 
 Valley Bank of Nevada,
 
 114 Nev. 1313, 1324, 970 P.2d 1062, 1069 (1998) (“ ‘[fjailure to object to asserted errors at trial will bar review of an issue on appeal’ ” (quoting
 
 McCullough
 
 v.
 
 State, 99
 
 Nev. 72, 74, 657 P.2d 1157, 1158 (1983)).
 

 [59]
 

 Helminski,
 
 766 F.2d at 217;
 
 see also Cary By and Through Cary v. Oneok, Inc.,
 
 940 P.2d 201, 205 (Okla. 1997) (stating that “[a] jury will generally follow the court’s instructions and decide a case based on the law presented”).
 

 [60]
 

 Wohlers
 
 v.
 
 Bartgis,
 
 114 Nev. 1249, 1261, 969 P.2d 949, 958 (1998) (quoting
 
 Bally’s Employees’ Credit Union
 
 v.
 
 Wallen,
 
 105 Nev. 553, 555, 779 P.2d 956, 957 (1989) (alterations in original)).
 

 [61]
 

 Day
 
 v.
 
 Zubel,
 
 112 Nev. 972, 976, 922 P.2d 536, 538 (1996).
 

 [62]
 

 Crow-Spieker #23
 
 v.
 
 Helms,
 
 103 Nev. 1, 3 n.2, 731 P.2d 348, 350 n.2 (1987).
 

 [63]
 

 88 Nev. 360, 498 P.2d 366 (1972),
 
 abrogated on other grounds by Motenko v. MGM Dist., Inc.,
 
 112 Nev. 1038, 1041-42, 921 P.2d 933, 935 (1996).
 

 [64]
 

 See Bank of Nevada
 
 v.
 
 Speirs,
 
 95 Nev. 870, 875, 603 P.2d 1074, 1077 (1979).
 

 [65]
 

 Lynn v. Ingalls,
 
 100 Nev. 115, 119, 676 P.2d 797, 800 (1984).
 

 [66]
 

 Medical Device Alliance, Inc. v. Ahr,
 
 116 Nev. 851, 863 n.7, 8 P.3d 135, 142 n.7 (2000).