# IN THE SUPREME COURT OF IOWA

No. 15–2016

Filed June 16, 2017

Amended September 5, 2017

**MELISSA STENDER,**

Appellant,

vs.

**ANTHONY ZANE BLESSUM,**

Appellee,

**MINNESOTA LAWYERS MUT. INS. CO.,**

Intervenor-Appellee.

Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Judge.

A jury trial was held on plaintiff's claims of legal malpractice, assault and battery, and punitive damages. The jury returned verdicts in favor of the defendant on the submitted legal malpractice claims and in favor of the plaintiff on the assault and battery claim. The jury also awarded the plaintiff damages and punitive damages. The plaintiff appeals and the defendant cross appeals. **AFFIRMED.**

Roxanne Barton Conlin of Roxanne Conlin & Associates, P.C., Des Moines, and Laurie Anne Stewart of Stewart Law & Mediation, P.L.L.C., Panora, for appellant.

David L. Brown and Alexander E. Wonio of Hansen, McClintock & Riley, Des Moines, for appellee.

Richard J. Thomas of Burke & Thomas, PLLP, Arden Hills, Minnesota, for intervenor-appellee.

**ZAGER, Justice.**

A plaintiff brought claims against her former attorney for legal malpractice, assault and battery, and punitive damages. At the close of the plaintiff's case, the district court granted the defendant's motion for directed verdict on two legal malpractice claims: one regarding the preparation of a will and the other for breach of fiduciary duty. The district court submitted to the jury two claims of alleged legal malpractice: representation of the plaintiff in her divorce and representation of the plaintiff in pursuing a claim for assault against her former spouse. The jury returned verdicts for the defendant on the two submitted legal malpractice claims and returned verdicts for the plaintiff on the assault and battery claim and on the punitive damages claim. The jury awarded the plaintiff combined damages of $498,562.44. The plaintiff appeals the district court's order granting the motion for directed verdict on the two additional claims of legal malpractice. The plaintiff also appeals various evidentiary rulings made by the district court. The defendant cross-appeals on the issue of damages. For the reasons discussed below, we affirm the district court. While we find that the defendant's cross-appeal was untimely, we reject on the merits the defendant's challenge to the amount of the jury award.

**I. Background Facts and Proceedings.**

In September 2008, Melissa Stender met with attorney Anthony Zane Blessum for legal assistance in a divorce proceeding against her then-husband, Phillip Stender.[1] Blessum had previously represented Phillip in a separate legal matter. In October, Blessum filed a petition for

---

[1]For clarity, in this opinion we refer to the parties by their last names and refer to Stender's ex-husband as Phillip.

dissolution of marriage on Stender's behalf. As noted in the petition, the parties were married in 1993. Blessum did not conduct any written discovery, take depositions, or obtain financial affidavits in the case.

In February 2009, Blessum drafted a proposed divorce decree and sent it to both Stender and Phillip. On March 4, Blessum sent a second proposed divorce decree that included changes that Blessum had not discussed with Stender. Stender was unaware that Blessum had made changes in the second proposed divorce decree and believed the changes unfairly favored Phillip. When Phillip received the second proposed decree, he went to the couple's home and physically and sexually assaulted Stender.

On March 25, Stender signed the second proposed decree upon the advice of Blessum. Stender testified at trial that she was a homemaker for most of her marriage to Phillip. She testified she was unaware of the amount in Phillip's retirement accounts, the state of the household finances, or the amount of alimony to which she might be entitled. She signed the decree based on Blessum's advice that the contents of the decree represented everything she was entitled to receive in the divorce. The final divorce decree awarded Stender $110,000 from Phillip's retirement account, half of the home furnishings, and $400 per week in spousal support for a period of four and one-half years. The decree awarded Phillip all of the other accounts and the majority of the other assets of the marriage including the family home, a number of vehicles and motorcycles, and farm equipment. Blessum filed the decree on March 30. However, Blessum failed to prepare or file a Qualified Domestic Relations Order (QDRO) to document Stender's interest in Phillip's retirement account. Stender was unaware that Blessum had not prepared or filed the QDRO.

Approximately two years later, in mid-March 2011, Blessum called Stender. Blessum informed Stender that Phillip had called to ask if he would receive the entire balance of his retirement account if "something happened" to Stender. Stender was afraid of Phillip after the assault and asked Blessum if he believed Phillip's call was threatening. Blessum told her that was exactly how he took the call. Stender became concerned about how her assets would be divided among her three children if she were to pass away and asked Blessum if she needed a will. Blessum responded in the affirmative.

Stender met with Blessum on March 22 to discuss drafting a will. Stender told Blessum that she wanted all of her estate assets divided equally between her three children. Based on Blessum's advice, Stender believed that Phillip would get all of her assets after her death if she did not draft a will. This was inaccurate because, even if Stender had died intestate, Stender's probate assets would have been equally divided between her three children.[2] However, the issue of Stender's interest in Phillip's retirement account had still not been addressed by entry of a QDRO.

After the meeting, Blessum called Stender and asked if she wanted to meet and catch up. She agreed, and they met at a local restaurant. During this meeting, Blessum told Stender he was unhappy in his marriage. At the end of the evening, Blessum kissed Stender. After Stender got in her car but before she left the parking lot, Blessum sent her a text message asking if they could meet again. Over the next two weeks, Blessum and Stender continued to meet and talk about intimate

---

[2]*See* Iowa Code § 633.219(1) (2011).

topics such as Stender's childhood trauma and her marital and sexual abuse. Within two or three weeks, they began a sexual relationship.

While this sexual relationship continued, Blessum performed several other legal services for Stender. On June 28, Stender executed the will that Blessum had prepared. On August 9, Blessum sent a demand letter to Phillip. In the letter, Blessum demanded that Phillip agree to three changes in the divorce decree in exchange for Stender's refraining from filing a civil suit against him for the physical and sexual assault Phillip committed against her in 2009. Blessum was aware the assaults occurred in 2009, and either knew or should have known the statute of limitations had run by the time he sent the letter to Phillip.[3] On August 23, Blessum filed the QDRO formalizing Melissa's interest in Phillip's retirement account. In January 2012, while the relationship was still ongoing, Blessum assisted Stender with another legal matter.

On June 10, Stender went to Blessum's house to confront him about rumors he was seeing other women. When she arrived, she went into the kitchen where she noticed a bottle of wine with two glasses set on the counter and a frying pan with food on the stove. She picked up the pan from the stove and confronted Blessum by asking if he was cooking for another woman. While Stender was holding the pan, Blessum was standing in front of her. At some point, the pan spilled onto Stender's shoulder and hot grease caused burns on her back. Because the grease went through her clothing, Blessum began taking off Stender's shirt.

---

[3]*See* Iowa Code § 614.1(2). Also, Stender claims she did not know that Blessum had sent the letter to Phillip or have any knowledge of its contents. She claims she did not request that Blessum draft such a letter, nor did she give her permission. The record does not reflect whether any action was taken on this letter.

Stender became anxious from the confrontation and the grease burn. Blessum went outside to retrieve Stender's purse from her vehicle that contained her anxiety medication. When Blessum came back inside with Stender's purse, she told him she was done with the relationship and bent down to get the pills out of her purse. While Stender was bent over, but before she could take the pills, Blessum began hitting her arm, forearm, head, and neck. After Blessum hit her, Stender grabbed some of the pills that had spilled on the floor and swallowed them. Stender tried to run out of the house, but Blessum caught her and dragged her back inside. Blessum threw her into the corner and started calling her a "subservient slave." He pulled her through the living room onto the couch and threatened to sexually assault her. Blessum told Stender if she thought the "other men have hurt [her], . . . just wait and see what [he] do[es] to [her]." He told her he was going to make her vomit her pills so she would remember the entire assault.

Blessum went to the kitchen to get a glass of water to force Stender to vomit. After he left the room, Stender grabbed Blessum's home phone and called 911. She was unaware whether the call went through but left it under a pile of papers when she heard Blessum returning to the living room. The call connected and the remainder of the assault was recorded. Police were dispatched to Blessum's house. Before the police responded, Blessum pinned Stender to the couch and strangled her. He then poured water down her throat and put his fingers in her mouth in an attempt to make her vomit. Stender kept screaming in hopes that the call had connected to the 911 operator. Blessum again pinned Stender with his knees and bound her arms over her head. He began to forcefully remove her jeans. Blessum had removed her jeans past her hips when the police knocked on the door. Stender began screaming for

help. The police arrested Blessum at the scene. The police also called an ambulance, and Stender was transported to the hospital for medical treatment.

Later in June, Blessum began sending letters to Stender. In the letters, he acknowledged that he had dated other women at the same time as Stender and that he gave her a sexually transmitted disease. The letters also acknowledged the assault and included an apology for all of his misdeeds. Stender also received anonymous items in the mail during this time. On September 19, Stender filed a petition for relief from domestic abuse against Blessum. The district court granted a temporary restraining order that same date. On October 29, the district court entered a protective order by consent agreement between the parties.

Stender obtained new counsel in October and her new counsel began requesting Stender's client files from Blessum. Blessum delivered the client files in January 2013, but the documents related to the preparation of Stender's will were missing.

On January 14, the State filed criminal charges against Blessum for the assault against Stender. Blessum was charged with assault causing bodily injury, *see* Iowa Code § 708.2(2), and assault with intent to commit sexual abuse, *see id.* § 709.11(2). Blessum ultimately pleaded guilty to assault causing bodily injury. On March 26, Blessum was sentenced to one year in jail with all but seven days suspended. A sentencing no contact order was also entered on that date restraining Blessum from any contact with Stender for five years.

On December 4, Stender filed this civil action against Blessum. She alleged claims of domestic assault, battery, false imprisonment, negligent transmission of sexually transmitted diseases, outrageous

conduct and intentional infliction of emotional distress, legal malpractice, and breach of fiduciary duty.

On March 27, 2015, we suspended Blessum's license to practice law for eighteen months. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Blessum*, 861 N.W.2d 575, 595 (Iowa 2015). We found he violated three of our Iowa Rules of Professional Conduct. *Id.* at 577. Blessum violated rule 32:1.8(j) (sexual relationship with a client), rule 32:8.4(b) (criminal act adversely reflecting on a lawyer's fitness to practice law), and rule 32:1.15(c) (trust account practices). *Id.* at 588–91.

On June 25, Stender voluntarily dismissed two claims in her civil lawsuit: the claim for false imprisonment and the claim for negligent transmission of sexually transmitted diseases. Trial was set to commence on July 6.

On July 2, Stender's counsel posted a Facebook message expressing her dissatisfaction with the outcome of Blessum's attorney disciplinary case. The Facebook post also stated "I hope a jury will be a little harder on him!" Blessum moved for a continuance of the trial, which the district court granted, noting that the timing of the post was "disturbing and suspicious." The trial was rescheduled for November 2. On October 29, Stender voluntarily dismissed her claims for outrageous conduct and intentional infliction of emotional distress.

Jury trial commenced on November 2, and Stender concluded her presentment of evidence on November 10. Blessum moved for a directed verdict on all of the legal malpractice claims and on the breach-of-fiduciary-duty claim. The district court granted a directed verdict on the legal malpractice claim regarding the preparation of the will and on the breach-of-fiduciary-duty claim. The district court concluded that, with regard to the drafting of the will, there was no evidence that the will

contained any defect or that its preparation otherwise fell below the standard of care for attorneys. The district court also granted a directed verdict on the claim for breach of fiduciary duty. The district court concluded that there was not a "single piece of evidence that the plaintiff suffered emotional damage from just being in a relationship." The district court denied the motion for directed verdict on two additional claims of legal malpractice.

On November 13, the Friday before closing arguments were set to commence, the *Des Moines Register* published an online opinion article comparing the jury trial to the disciplinary case and noting that "hopefully the jury will do something more." On Sunday, November 15, the article was published in the print version of the newspaper.

On November 16, the jury heard closing arguments. The district court submitted four claims for the jury to consider: (1) legal malpractice in Blessum's representation of Stender in her divorce, (2) legal malpractice in Blessum's representation of Stender in her potential claim for assault or battery against her ex-husband, (3) assault and battery by Blessum, and (4) punitive damages. On November 17, the jury returned its verdicts. The jury decided in Blessum's favor on the two legal malpractice claims. The jury returned verdicts in Stender's favor on the assault and battery claim and on the punitive damages claim. The jury awarded Stender $398,562.44 for the assault and battery and $100,000 in punitive damages, for a total award of $498,562.44.

On November 18, one of the jurors contacted the district court judge to convey that he had a hard time sleeping the night the jury reached its verdicts, and he felt as though justice had not been served. Specifically, the juror believed five of the six jurors did not agree with the amount of damages that were ultimately awarded to Stender. The juror

also believed that the *Des Moines Register* article played a role in the jury deliberations because he claimed a number of jurors had read the article prior to deliberating. Because of the juror's concerns, the district court set a hearing on the matter for November 23.

On November 25, before the district court issued its ruling, Stender filed a notice of appeal, thus depriving the district court of jurisdiction to hear any posttrial matters, including the issues raised by the juror. In her appeal, Stender claims that the district court erred in granting the directed verdicts. Blessum cross-appealed for a new trial on the issue of damages awarded for the assault and battery and punitive damages claims. We retained the appeal.

**II.  Standard of Review.**

We review a ruling on a motion for a directed verdict for correction of errors at law. *Hook v. Trevino*, 839 N.W.2d 434, 439 (Iowa 2013). "We review the evidence in the light most favorable to the nonmoving party . . . ." *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 300 (Iowa 2013). In doing so, we take into consideration all reasonable inferences the jury could fairly make, regardless of whether there is any evidence in contradiction. *Id.* Ultimately, we decide whether the district court's determination that there was or was not sufficient evidence to submit the issue to the jury was correct. *Id.*

We review evidentiary rulings for an abuse of discretion. *Giza v. BNSF Ry.*, 843 N.W.2d 713, 718 (Iowa 2014). A district court abuses its discretion when it bases its decisions on grounds or reasons clearly untenable or to an extent that is clearly unreasonable. *Sioux Pharm, Inc. v. Eagle Labs., Inc.*, 865 N.W.2d 528, 535 (Iowa 2015). A district court also abuses its discretion if it bases its conclusions on an erroneous application of the law. *Id.*

When we review claims for excessive damages, "we view the evidence in the light most favorable to the plaintiff." *Kuta v. Newberg*, 600 N.W.2d 280, 284 (Iowa 1999). We should not "disturb a jury verdict for damages unless it is 'flagrantly excessive or inadequate, so out of reason so as to shock the conscience, the result of passion or prejudice, or lacking in evidentiary support.'" *Id.* (quoting *Olson v. Prosoco, Inc.*, 522 N.W.2d 284, 292 (Iowa 1994)). We apply an abuse of discretion standard because the trial court had the advantage of seeing and hearing the evidence. *Id.*

**III. Analysis of the Rulings on the Motions for Directed Verdicts.**

Stender claims the district court erred in granting the motions for directed verdict for a number of reasons, which we address in turn.

**A. Per Se Legal Malpractice.** Stender argues that the existence of an attorney–client sexual relationship forms a per se basis for her legal malpractice and breach-of-fiduciary-duty claims. While we have precedent recognizing that a violation of our ethical rules can be used as some evidence of negligence, Stender argues we should take that reasoning one step further and hold that a violation of the Iowa Rules of Professional Conduct can be introduced as per se evidence of legal malpractice in civil cases. As part of our analysis, it is important to provide some context to this requested relief.

1. *Iowa background.* We have decided a number of cases involving our ethical rules and claims of legal malpractice. While we have generally allowed violations to be used as evidence of negligence, we have been careful to caution that evidence of negligence is not the same as conclusive proof of negligence. *See Ruden v. Jenk*, 543 N.W.2d 605, 611

(Iowa 1996); *see also Vossoughi v. Polaschek*, 859 N.W.2d 643, 649–50 (Iowa 2015); *Faber v. Herman*, 731 N.W.2d 1, 7 (Iowa 2007).

To establish a prima facie claim for legal malpractice, a plaintiff must produce substantial evidence demonstrating: (1) an attorney–client relationship existed giving rise to a duty; (2) the attorney violated or breached the duty, either by an overt act or a failure to act; (3) the breach of duty proximately caused injury to the client; and (4) the client did sustain an actual injury, loss, or damage. *Trobaugh v. Sondag*, 668 N.W.2d 577, 580 n.1 (Iowa 2003).

In *Ruden*, we held that the plaintiff could use a violation of the Iowa Code of Professional Responsibility for Lawyers as evidence of negligence, but ultimately held that the attorney's acts or omissions were not sufficient to demonstrate proximate cause of any damages as a matter of law. *Id.* at 611–12. We also cautioned that while a violation may constitute "*some* evidence of negligence," our ethical rules "do[] not undertake to define standards of civil liability." *Id.* at 611 (emphasis added). In *Crookham v. Riley*, we again noted that a violation of our disciplinary rules is "some evidence of negligence." 584 N.W.2d 258, 266 (Iowa 1998). We noted that expert testimony on the standard of care due to a client is normally required for a legal malpractice claim. *Id.*

Additionally, the language of the Iowa Rules of Professional Conduct expressly addresses this issue. This language provides,

> Violation of a rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached. In addition, violation of a rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation. The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the rules can be subverted when they are invoked

> by opposing parties as procedural weapons. The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule. Nevertheless, since the rules do establish standards of conduct by lawyers, a lawyer's violation of a rule may be evidence of breach of the applicable standard of conduct.

Iowa R. Prof'l Conduct ch. 32 Scope [20]. This is similar to the scope contained in the ABA Model Rules of Professional Conduct. The model rules provide that a "[v]iolation of a [r]ule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached." Model Rules Prof'l Conduct Scope [20] (Am. Bar Ass'n 2014). The model rules also provide that the rules were not designed to be used as a basis for civil liability. *Id.* The rules may instead be used as evidence of a breach of the standard of conduct. *Id.*

2. *Approach of other states.* There are three approaches courts use to determine whether a violation of an ethical rule may be used to establish a per se private cause of action for legal malpractice. First, one jurisdiction allows the violation of an ethical rule to create a rebuttable presumption of negligence. *Hart v. Comerica Bank*, 957 F. Supp. 958, 981 (E.D. Mich. 1997) (noting that violations of the ethical rules "create a rebuttable presumption of legal malpractice, although they do not constitute negligence *per se*").[4] A second approach, adopted by a larger number of courts, is that ethical rule violations are inadmissible in legal malpractice claims. *See Ex parte Toler*, 710 So. 2d 415, 416 (Ala. 1998)

---

[4]*See also Mainor v. Nault*, 101 P.3d 308, 320 (Nev. 2004) (noting that "[a]t least one jurisdiction has held that a violation of a professional rule creates a rebuttable presumption of negligence," in reference to the *Hart* case), *abrogated on other grounds by Delgado v. Am. Family Ins. Grp.*, 217 P.3d 563, 567 (Nev. 2009).

(holding that the trial judge properly excluded evidence of a violation of the rules of professional conduct because such evidence cannot be used in a legal malpractice action); *Orsini v. Larry Moyer Trucking, Inc.*, 833 S.W.2d 366, 369 (Ark. 1992) (holding that it was proper for the trial court to refuse to admit into evidence the model rules of professional conduct because such rules were meant as guidelines only and were not meant to establish a civil cause of action for malpractice); *Webster v. Powell*, 391 S.E.2d 204, 208 (N.C. Ct. App. 1990) (holding that the trial court properly excluded evidence of a violation of an ethical rule because such a breach is not a basis for civil liability); *Hizey v. Carpenter*, 830 P.2d 646, 652–54 (Wash. 1992) (en banc) (holding that the jury not be informed of rules of professional conduct, either through jury instructions or expert testimony, because the rules were guidelines and provided an ethical standard distinct from the civil standard). But overwhelmingly, a third approach is that the violation of an ethical rule alone does not establish a per se private cause of action for legal malpractice but may be used as relevant evidence for the standard of care. Accordingly, a number of state supreme courts,[5] state appellate

---

[5]*Allen v. Lefkoff, Duncan, Grimes & Dermer, P.C.*, 453 S.E.2d 719, 720–21 (Ga. 1995) (noting that the rules of professional conduct were relevant to the standard of care but declining to hold a violation can be the sole basis for per se negligence); *Mainor,* 101 P.3d at 321 (holding the district court was correct in determining the rules of professional conduct "were not meant to create a cause of action for civil damages . . . because the rules serve[] merely as evidence of the standard of care, not as a basis for per se negligence"); *Bob Godfrey Pontiac, Inc. v. Roloff*, 630 P.2d 840, 848 (Or. 1981) ("The statute or Code of Professional Responsibility was not intended to create a private cause of action. On the contrary, the sole intended remedy for a violation of such a statute or code is the imposition of discipline by disbarment, suspension or reprimand of the offending attorney."); *Diluglio v. Providence Auto Body, Inc.*, 755 A.2d 757, 772 n.16 (R.I. 2000) ("[V]iolations of the rules of professional conduct cannot be used to establish a cause of action or to create any presumption that a legal duty has been breached . . . ."); *Vallinoto v. DiSandro*, 688 A.2d 830, 837 (R.I. 1997) ("The clear and unanimous judicial rule, as well as academic authority, is that mere violation of codes of professional responsibility and conduct do not automatically establish a private

courts,[6] and federal courts[7] have held that the violation of an ethical rule, without more, is insufficient to establish a per se cause of action for legal malpractice.

We likewise choose to adopt the majority approach and hold that a violation of one of our Iowa Rules of Professional Conduct cannot be used to establish a per se claim for legal malpractice. A violation may, however, be used as some evidence of negligence as provided in our prior caselaw. *See, e.g.*, *Crookham*, 584 N.W.2d at 266. But before a violation of our rules of professional conduct can be used—even as some evidence of negligence—there must be an underlying actionable claim against the attorney arising out of how the attorney mishandled a legal matter. To find differently would mean that a violation of the rules themselves provides plaintiffs with an independent cause of action. This result is

_____

cause of action for damages sounding in negligence for breach of fiduciary obligation."); *Strohm v. ClearOne Commc'ns, Inc.*, 308 P.3d 424, 442–43 (Utah 2013) ("Violation of a rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached. . . . The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability." (quoting Utah R. Prof'l Conduct Preamble)).

[6]*Hill v. Willmott*, 561 S.W.2d 331, 334 (Ky. Ct. App. 1978) ("[A] duty set forth in the Code and the Rules establishes the minimum level of competence for the protection of the public and a violation thereof does not necessarily give rise to a cause of action."); *Spencer v. Burglass*, 337 So. 2d 596, 599 (La. Ct. App. 1976) ("Plaintiff has cited no authority for her proposition that these standards provide her with a cause of action under a general tort or negligence concept."); *Gifford v. Harley*, 404 N.Y.S.2d 405, 407 (App. Div. 1978) ("Plaintiff's argument that violations of our civil practice code give rise to liability is far afield."); *Martin v. Trevino*, 578 S.W.2d 763, 770 (Tex. Civ. App. 1978) ("[T]he violation by an attorney of the disciplinary rules adopted by the Texas Supreme Court does not of itself create a private cause of action.").

[7]*Universal Mfg. Co. v. Gardner, Carton & Douglas*, 207 F. Supp. 2d 830, 832–33 (N.D. Ill. 2002) (stating that while an alleged violation of ethical rules does not by itself give rise to a claim for malpractice under Illinois law, "the rules of professional conduct may be relevant to determining the standard of care in a legal malpractice claim"); *Montgomery v. Gooding, Huffman, Kelly & Becker*, 163 F. Supp. 2d 831, 836 (N.D. Ohio 2001) ("Violations of the rules of the Code of Professional Responsibility, however, do not constitute malpractice *per se.*").

one that both our rules and our cases have specifically rejected. *Id.* ("Violation of the disciplinary rules constitutes some evidence of negligence. In a legal malpractice action, expert testimony upon the standard of care is usually required." (Citation omitted.)); *Ruden*, 543 N.W.2d 611 ("Although the Iowa Code of Professional Responsibility for Lawyers does not undertake to define standards of civil liability, it constitutes some evidence of negligence."); Iowa R. Prof'l Conduct ch. 32 Preamble & Scope [20] ("Violation of a rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached.").

Here, Blessum's sexual relationship in violation of our rules of professional conduct does not by itself give rise to a legal malpractice claim. In order to succeed on her claim for legal malpractice, Stender would need to demonstrate a duty that was violated and not just the sexual relationship alone. *See, e.g.*, *Ruden*, 543 N.W.2d at 610. Stender did not introduce evidence of any breach of duty owed to her in her legal malpractice claim separate and distinct from the existence of an attorney–client sexual relationship. Likewise, Stender did not introduce evidence of any injury, loss, or damage separate from the underlying sexual relationship. As such, the violation of rule 32:1.8(j) cannot be used, on its own, to establish a per se case of legal malpractice.

**B. Drafting of the Will.** Stender argues that Blessum committed legal malpractice by his actions in drafting her will. The district court granted a directed verdict on this claim for legal malpractice, finding Stender did not allege any defect in the will itself. However, Stender argues the basis for this claim of legal malpractice is not that the will is defective. Rather, she asserts the bases of her claim for legal malpractice in drafting the will are multifaceted and include the following:

(1) Blessum falsely and knowingly represented to Stender that a will was necessary to ensure that her children would receive her estate in the event of her death; (2) Blessum made such a false representation for the sole purpose of pursuing a sexual relationship with her; (3) Blessum used his power and influence, and the knowledge of Stender's vulnerability and fear of her ex-husband, to induce her into believing that her life had been threatened and that she needed a will as soon as possible to safeguard her children's inheritance; and (4) Blessum drafted the will while engaged in a sexual relationship with her. Stender claims the directed verdict was in error and this malpractice claim should have been submitted to the jury.

To establish a claim for legal malpractice, a plaintiff must produce substantial evidence demonstrating (1) an attorney–client relationship existed giving rise to a duty; (2) the attorney violated or breached the duty, either by an overt act or a failure to act; (3) the breach of duty proximately caused injury to the client; and (4) the client did sustain an actual injury, loss, or damage. *Sabin v. Ackerman*, 846 N.W.2d 835, 839 (Iowa 2014); *Trobaugh*, 668 N.W.2d at 580. Legal malpractice exists when the attorney fails "to use such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of tasks which they undertake." *Millwright v. Romer*, 322 N.W.2d 30, 32 (Iowa 1982) (quoting *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 491 P.2d 421, 422–23 (Cal. 1971)); *see also Ruden*, 543 N.W.2d at 610–11.

In a claim for legal malpractice, "unless the plaintiff's claim is based on standards of care and professionalism understood and expected by laypersons, the plaintiff will have to retain an expert to go

forward."[8]  *Barker v. Capotosto*, 875 N.W.2d 157, 167 (Iowa 2016). Generally, we require expert testimony on the standard of care in legal malpractice actions.  *Crookham*, 584 N.W.2d at 266.  This is because the measure for the standard of care required is that of a similarly situated ordinary lawyer.  16 Gregory C. Sisk & Mark S. Cady, *Iowa Practice Series:™ Lawyer & Judicial Ethics* § 13:4(b), at 1106–07 (2015).

The question of whether the drafting of a will fell outside the ordinary skill, prudence, or diligence expected of a similarly situated, ordinary attorney is a technical legal question that requires the use of an expert witness.  The technicalities of drafting a will and the question of negligence and causation are not in the realm of topics normally understood or expected of laypersons.  Stender did not introduce any expert witness testimony on the issue of whether Blessum committed legal malpractice in the drafting of her will.

Likewise, Stender does not argue that the will prepared by Blessum was defective.  The lawyer's duty in a legal malpractice case is "to use 'such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess and exercise' in performing the task which he undertakes."  *Ruden*, 543 N.W.2d at 610–11 (quoting *Millwright*, 322 N.W.2d at 32).  A claim for legal malpractice is necessarily grounded in the allegation that the legal services provided by

---

[8]When we have excused a plaintiff from the requirement to provide expert testimony, the attorney's behavior has been overt and obvious to a layperson.  16 Gregory C. Sisk & Mark S. Cady, *Iowa Practice Series:™ Lawyer & Judicial Ethics* § 13:4(b), at 1106–07 (2015).  Some examples of obvious attorney errors are the failure to investigate the legal description of a parcel of land prior to paying excessive death taxes, lying to a client to cover up a conflict of interest, and the failure to communicate an offer of a settlement to a client.  *Wilson v. Vanden Berg*, 687 N.W.2d 575, 583 (Iowa 2004); *Schmitz v. Crotty*, 528 N.W.2d 112, 116 (Iowa 1995); *Whiteaker v. State*, 382 N.W.2d 112, 115–16 (Iowa 1986).

an attorney were negligently performed. In order to establish a prima facie claim of legal malpractice, Stender was required to produce evidence showing what the duty was and how the attorney breached this duty. Then, even if Stender did produce evidence that such a duty was breached, the attorney's breach must have caused "actual injury, loss, or damage." *Vissoughi*, 859 N.W.2d at 649 (quoting *Ruden*, 543 N.W.2d at 610). An attorney's act or omission that breached the duty must cause injury to Stender's interest by way of loss or damage. *Id.* Stender failed to introduce any evidence, separate from the sexual relationship, of a breach of any duty owed to her. Finally, there was no evidence of any actual injury, loss, or damage claimed by Stender separate from the damages resulting from the assault. We affirm the decision of the district court granting the motion for directed verdict as to this claim of legal malpractice.

**C. Breach-of-Fiduciary-Duty Claim.** In the district court, Stender sought to instruct the jury on a claim for breach of fiduciary duty as a separate and independent cause of action.[9] After the close of Stender's case-in-chief, the district court granted Blessum's motion for directed verdict. The district court found the claim was not supported by any evidence in the record.

The issue on appeal in this case is one of first impression for us: whether the sexual relationship between Stender and Blessum, by itself, gives rise to an independent cause of action for breach of fiduciary duty. Stender argues that it does, as she and Blessum were in a sexual

---

[9]Stender's position on her claim for breach of fiduciary duty is illustrated by her proposed final jury instruction No. 21. In this instruction, Stender claimed Blessum breached a fiduciary duty to her by beginning a sexual relationship and then assaulting her.

relationship while they were also in a fiduciary, attorney–client relationship. At the outset, we recognize that the creation of an attorney–client relationship does impose on attorneys certain fiduciary duties. *See Kurth v. Van Horn,* 380 N.W.2d 693, 696 (Iowa 1986) ("Some relationships necessarily give rise to a fiduciary relationship . . . [and] would include those between an attorney and client . . . ."). The creation of an attorney–client relationship does not, however, impose upon the attorney fiduciary duties that extend on indefinitely or into aspects of an attorney's personal life outside the scope of the attorney–client relationship. *Wagner v. Wagner,* 45 N.W.2d 508, 509 (Iowa 1951) ("[A] person in a fiduciary relationship to another is under a duty to act for the benefit of the other as to matters within the scope of the relationship . . . .").

A number of other courts have directly considered this issue. These courts have concluded that a sexual relationship between an attorney and a client, when it had no impact on the legal services provided, does not give rise to a claim for breach of fiduciary duty. The leading case on the issue is *Kling v. Landry,* 686 N.E.2d 33 (Ill. App. Ct. 1997). The attorney, Landry, represented a client, Kling, in two separate legal matters. *Id.* at 35. Kling claimed that Landry coerced her into a sexual relationship during the course of the representation. *Id.* Kling alleged that, while Landry was representing her in a dissolution of marriage action, he came to her home to prepare for trial. *Id.* at 36. While at her home, Landry threw her on the bed and began to initiate sexual intercourse. *Id.* Kling alleges she submitted to the sexual intercourse because she was afraid Landry would not continue to represent her if she refused. *Id.* After the final judgment for dissolution of marriage was entered, Landry represented Kling again in a

modification of the decree. *Id.* Again, Landry visited Kling's home to prepare for trial and initiated sexual intercourse. *Id.* Thereafter, Kling terminated Landry's representation and alleged that the petition for modification was frivolous. *Id.*

Kling filed a four-count petition. *Id.* Pertinently, Kling claimed Landry breached his fiduciary duty to her by improperly using his position as her attorney to coerce her into sexual intercourse. *Id.* Landry filed a motion to dismiss the claim for breach of fiduciary duty, which the district court granted. *Id.* at 36–37.

The court began its analysis by noting that the attorney–client fiduciary relationship exists as a matter of law. *Id.* at 39. It reviewed a number of Illinois cases regarding the breach of fiduciary duty and concluded,

> We agree that an attorney breaches his fiduciary duty to his client by exploiting his position as an attorney to gain sexual favors. We believe that such a breach arises where the attorney: (1) makes his legal representation contingent upon sexual involvement; (2) compromises the client's legal interests as a result of the sexual involvement; or (3) uses information, obtained in the course of representing a client which suggests that the client might be unusually vulnerable . . . .

*Id.* at 39–40. However, the court also noted that "sexual intercourse between two consenting adults is not, of itself, actionable conduct." *Id.* at 40.

Overwhelmingly, courts have followed the *Kling* approach and held a sexual relationship alone cannot be the basis for a breach of fiduciary duty or legal malpractice claim, absent some link between the sexual relationship and a wrong committed in the scope of the legal representation. *See, e.g., Cecala v. Newman*, 532 F. Supp. 2d 1118, 1135 (D. Ariz. 2007) (holding that a plaintiff client who enters into a

consensual sexual relationship with an attorney without any independently inappropriate conduct on the part of the lawyer, cannot recover in an action unless the plaintiff's legal position was negatively affected by the relationship); *Tante v. Herring*, 453 S.E.2d 686, 695 (Ga. 1994) (finding there was no evidence that the sexual relationship between the lawyer and client had any effect on the lawyer's performance of legal services and thus a claim for legal malpractice did not stand); *Guiles v. Simser*, 826 N.Y.S.2d 484, 485–86 (App. Div. 2006) ("Defendant's sexual encounters with plaintiff clearly constituted ethical violations, but '[t]he violations of a disciplinary rule does not, without more, generate a cause of action.'" (alteration in original) (quoting *Schwartz v. Olshan Grundman Frome & Rosenzweig*, 753 N.Y.S.2d 482 (2003))); *Vallinoto*, 688 A.2d at 834–35 (finding that although there was an attorney–client sexual relationship, that alone was insufficient to demonstrate that the attorney's legal services departed from the ordinary standard of care); *Bevan v. Fix*, 42 P.3d 1013, 1032 (Wyo. 2002) ("Simply asserting that [the attorney's] conduct was improper or even immoral is insufficient to support a claim for malpractice.").

A New York court upheld a trial court's order dismissing a plaintiff's claim of breach of fiduciary duty based solely on a sexual relationship. *Guiles*, 826 N.Y.S.2d at 486. In that case, the plaintiff had retained an attorney for assistance in a dissolution of marriage case, and the attorney pursued her romantically. *Id.* at 485. The attorney was later terminated from his job and referred to the state's committee on professional standards because of the sexual relationship. *Id.* In her pleadings, the plaintiff did not allege that the attorney was negligent in his legal services, but rather that the relationship alone served as a basis for her breach-of-fiduciary-duty claim. *Id.* The court found that while

the sexual relationship was a violation of a disciplinary rule, the violation "does not, without more, generate a cause of action." *Id.* at 486 (quoting *Schwartz*, 753 N.Y.S.2d at 487). Further, the sexual relationship alone was not enough to demonstrate success on the three elements required for a legal malpractice claim—that there was negligence in the attorney's legal representation, that said negligence was the proximate cause of the plaintiff's loss, and that the plaintiff suffered actual and ascertainable damages. *Id.*

Similarly, an Illinois appellate court found that the existence of a sexual relationship, without the client alleging a breach that is clearly linked to a deficit in the attorney's actual legal representation, is insufficient to sustain a claim for breach of a fiduciary duty. *Suppressed v. Suppressed*, 565 N.E.2d 101, 105 (Ill. App. Ct. 1990). In that case, a former client did not allege that an actual conflict of interest existed or that she was harmed in the legal action by the sexual relationship. *Id.* The court found that either "tangible evidence that the attorney actually made his professional services contingent upon the sexual involvement or that his legal representation of the client was, in fact, adversely affected" was required to sustain a claim for breach of a fiduciary duty. *Id.*

The above approach is supported by the Restatement (Third) of the Law Governing Lawyers, which requires a causal nexus between the alleged breach and the scope of a lawyer's professional representation. *See* Restatement (Third) of the Law Governing Lawyers § 49, at 348 (Am. Law Inst. 2000). The general duties a lawyer owes to a client that are within the scope of representation are to

> (1) proceed in a manner reasonably calculated to advance a client's lawful objectives, as defined by the client after consultation;

(2) act with reasonable competence and diligence;

(3) comply with obligations concerning the client's confidences and property, avoid impermissible conflicting interests, deal honestly with the client, and not employ advantages arising from the client-lawyer relationship in a manner adverse to the client; and

(4) fulfill valid contractual obligations to the client.

*Id.* § 16, at 146.  The approach of the Restatement is that "a lawyer is civilly liable to a client if the lawyer breaches a fiduciary duty to the client set forth in § 16(3) *and* if that failure is a legal cause of injury."  *Id.* § 49, at 348 (emphasis added).  The Restatement limits the fiduciary duties a lawyer owes a client to those

> duties specified in § 16(3): safeguarding the client's confidences . . . and property . . . ; avoiding impermissible conflicting interests . . . ; dealing honestly with the client . . . ; adequately informing the client . . . ; following instructions of the client . . . ; and not employing adversely to the client powers arising from the client-lawyer relationship.

*Id.* § 49 cmt. *b*, at 348.

Likewise, the *Mallen* treatise recognizes that there must be a causal relationship between the sexual relationship and the breach of a fiduciary relationship. 2 Ronald E. Mallen, *Legal Malpractice* § 16:7, Westlaw (database updated Jan. 2017).  While a client can bring a claim for breach of fiduciary duty because of a sexual relationship, the client must demonstrate that the relationship adversely affected the legal representation and caused the lawyer to breach a fiduciary obligation, such as that of loyalty or confidentiality.  *Id.*

> Claims of negligence require a *causal nexus* regarding the alleged sexual contact, the standard of care the attorney owes the client, and proof of injury arising from the attorney's actions and failures.  Claims of fiduciary breach also require a similar analysis, and require that the breach of a fiduciary obligation of loyalty or confidentiality must relate to the alleged sexual contact by the attorney.

*Id.* (emphasis added). Because of the requirement of a causal nexus, "[l]egal malpractice claims have predominantly been precluded as a cause of action for conduct surrounding sexual relationships, unless the relationship adversely affected the legal representation." *Id.*

Stender did not present sufficient evidence on any nexus between the sexual relationship and a breach of Blessum's fiduciary duties to her. Stender did not allege any deficiencies in the legal representation itself, nor did she link the sexual relationship to a deficiency in legal representation. Standing alone, the sexual relationship here was insufficient to sustain a claim for breach of fiduciary duty. We agree with the district court decision granting a directed verdict to Blessum on the claim of breach of fiduciary duty.

Finally, it is important to note that the district court did, in fact, recognize and instruct the jury on two alleged claims of legal malpractice presented by Stender where sufficient evidence was presented. While the claims were ultimately rejected by the jury, it demonstrates that the district court differentiated between the asserted claims of legal malpractice and breach of fiduciary duty when Stender argued that the sole basis of the claim was the sexual relationship. We find no error in the district court rulings granting the motions for directed verdict.

**IV. Evidentiary Rulings.**

Stender also appeals numerous rulings by the district court with respect to the scope of testimony and the admission of other testimony and evidence. We address each of these claims in turn.

**A. Scope of Expert Testimony.** Stender introduced the expert testimony of Matthew Brandes, a Cedar Rapids attorney who has practiced in family law for thirty-one years. Brandes offered expert testimony as to the general standard of care required of an attorney in

representing clients in dissolution of marriage actions and whether Blessum violated that standard of care. Brandes was also allowed to offer his expert opinion on the measure of damages sustained by Stender due to the mishandling of her divorce proceedings. However, the district court did not permit Brandes to testify about whether a sexual relationship between an attorney and client violates the Iowa Rules of Professional Conduct, whether a breach of fiduciary duty exists based on a sexual relationship between an attorney and a client, or whether a client can ever consent to a sexual relationship with an attorney.

Our test on the admissibility of expert testimony is liberal. *Ranes v. Adams Labs., Inc.,* 778 N.W.2d 677, 685 (Iowa 2010). The party seeking to introduce expert testimony carries the burden of demonstrating that the proposed expert is qualified and will present reliable opinion testimony. *Quad City Bank & Trust v. Jim Kircher & Assocs., P.C.,* 804 N.W.2d 83, 92 (Iowa 2011). We require two areas of inquiry to be met before expert testimony is admitted. *Ranes*, 778 N.W.2d at 685. First, the expert testimony must "assist the trier of fact" in either understanding the evidence or determining a fact at issue in the case. *Id.* (quoting Iowa R. Evid. 5.702). This preliminary question requires that the district court consider whether the proposed evidence is relevant. *Id.* Second, the expert witness must be properly qualified "by knowledge, skill, experience, training, or education." *Id.* (quoting Iowa R. Evid. 5.702).

Based on the analysis set forth above regarding the claims for legal malpractice and breach of fiduciary duty based solely on the sexual relationship, we affirm the district court's decision not to allow Brandes's expanded testimony. Brandes was allowed to testify as to the standard of care, the breach of the standard of care, and offer expert testimony as

to the claimed damages in Blessum's representation of Stender during her divorce and Blessum's representation of Stender in her potential claim for assault or battery against Phillip. Any expert testimony about the Iowa Rules of Professional Conduct prohibiting sexual relationships between attorneys and clients, and whether a client could consent to a sexual relationship, were not relevant to determine the remaining legal malpractice claims. Expert testimony on those issues would not assist the jury in determining a fact at issue in the case. We find that the district court did not abuse its discretion by not permitting the expanded expert testimony of Brandes as it was irrelevant to any issue the jury was properly instructed to consider.

**B. Disciplinary Proceeding Evidence.** The Iowa Supreme Court Attorney Disciplinary Board filed a complaint against Blessum, and subsequently, this court found violations of the Iowa Rules of Professional Conduct. The district court found evidence of the violations was not relevant. The district court likewise excluded documents from the disciplinary case, including the findings and conclusions of the grievance commission and our ethics opinion. On appeal, Stender argues these documents should have been admitted.

However, the district court did allow statements made by Blessum during the course of the disciplinary proceedings if they were introduced by Stender and were relevant to her claims. To the extent Stender needed to reveal the statements were made in the course of the disciplinary proceedings in order to introduce these relevant statements, such statements were allowed.

Evidence that is irrelevant to the issues in a case is not admissible. *See* Iowa R. Evid. 5.402; *see also State v. Putman*, 848 N.W.2d 1, 9 (Iowa 2014). Even evidence that is relevant should be excluded "if its probative

value is substantially outweighed by a danger of . . . unfair prejudice, confus[ion of] the issues, [or] misleading the jury." Iowa R. Evid. 5.403. When making the determination of whether to admit evidence, the district court must engage in a two-step inquiry, asking (1) whether the proposed evidence is relevant, and (2) if so, whether its probative value substantially outweighs the dangers of prejudice or confusion. *State v. Webster*, 865 N.W.2d 223, 242 (Iowa 2015).

We agree with the decision of the district court that the evidence that Blessum was charged with and found guilty of ethical violations, in addition to the underlying documents and our ethics opinion, was not relevant to the claims Stender presented to the jury. *See* Iowa R. Evid. 5.402. Stender was allowed to present two legal malpractice claims to the jury: that Blessum committed legal malpractice in his representation of her in the divorce, and that Blessum committed legal malpractice in his representation of her in a potential civil action against Phillip. It is important to contrast these claims with the issues involved in the disciplinary case.

The disciplinary case dealt with the delay in filing the QDRO, the attorney–client sexual relationship, trust account issues, and Blessum's underlying criminal conviction for assault as adversely reflecting on his fitness to practice law. *Blessum*, 861 N.W.2d at 585–90. These alleged ethical rule violations[10] are not relevant to the two malpractice claims submitted to the jury. The jury instruction for the legal malpractice claim based on the divorce required Stender to prove the following:

---

[10]We found Blessum violated rules 32:1.8(j), 32:8.4(b), and 32:1.15(c). *Blessum*, 861 N.W.2d at 586–91. We found no rule violation for the delay in filing the QDRO. *Id.* at 586.

> 1. That she would not have agreed to the asset distribution to which she did agree had the Defendant not been negligent; and
>
> 2. Either:
>
> a. Phillip Stender would have agreed to the Plaintiff receiving a greater asset in the parties' divorce; or
>
> b. if Phillip Stender would not have agreed to the Plaintiff receiving a greater asset award, the Plaintiff would have gone to trial and received a greater asset award as a result of the trial.

Our ethics opinion did not discuss the asset distribution of the divorce. With respect to the dissolution action, we only considered whether the length of time it took Blessum to file the QDRO violated rule 32:1.3. *Id.* at 586. We concluded that Blessum did not violate this rule. *Id.*

The jury instruction for the second malpractice claim based on Stender's potential case for assault and battery against Phillip required her to prove:

> 1. That she would have taken steps to file a lawsuit against Phillip Stender for assault and battery if the Defendant had not been negligent; and
>
> 2. She would have recovered damages in a lawsuit against Phillip Stender for assault and battery.

Again, our ethics opinion did not address Stender's potential claim against Phillip for the physical and sexual assault. *See id.* at 585–91.

The record also discloses that the evidence Stender now complains was erroneously excluded by the district court was never offered into evidence. We affirm the decision of the district court and find the district court did not abuse its discretion by excluding the evidence that we found Blessum committed ethical violations, the grievance commission's documents, and our ethics opinion.

**C. Collateral Estoppel/Issue Preclusion.** At trial, Stender requested that the district court take judicial notice of the disciplinary

case against Blessum. She additionally requested that Blessum be precluded from relitigating a number of issues. On appeal, Stender argues that the district court should have precluded Blessum from relitigating issues that were decided by this court during the course of the disciplinary proceedings.

The district court precluded Blessum from relitigating (1) the factual basis he gave for his guilty plea in the criminal case, (2) that he had a sexual relationship with Stender during the time he drafted her will, and (3) that an attorney–client relationship existed at the time he began a sexual relationship with Stender. The district court did not preclude Blessum from litigating the following:

> 1. [Blessum] made a conscious decision to act on his hostility toward [Stender] to assault her.
>
> 2. [Blessum] forcibly prevented [Stender] from leaving his home while dragging her and striking her repeatedly.
>
> 3. [Blessum] falsely attempted to take credit for summoning the police once he realized [Stender] had successfully dialed 911.
>
> 4. [Stender] had to go to the hospital because of the physical injury [Blessum] inflicted on her during his assault.
>
> 5. [Stender] continued to suffer mental and emotional injuries from the assault after it ended.
>
> 6. [Stender] was [Blessum's] client. If she had never retained him as her lawyer, [Stender] would not have been assaulted by him.
>
> 7. [Blessum] attempted to dissuade [Stender] from pressing charges against him after he assaulted her and he even instructed her on how to call the courthouse and have the charges dropped.
>
> . . . .
>
> 9. Because of the unequal nature of the relationship, [Stender] could not consent to the sexual relationship.

10. The sexual relationship involved unfair exploitation of the fiduciary role of the attorney and used the trust of [Stender] to her disadvantage.

The district court did not preclude numbers one through seven because they were not necessary and essential to the judgment in the ethics case. It did not preclude numbers six, nine and ten because they were not included in the fact findings made by this court in the ethics opinion.

In Blessum's disciplinary case, there were three ethical violations found: (1) sexual relations with a client under rule 32:1.8(j), (2) criminal act adversely reflecting on a lawyer's fitness to practice law under rule 32:8.4(b), and (3) a trust account violation under rule 32:1.15(c). *Blessum*, 861 N.W.2d at 585–91. We did not find a violation under rule 32:1.3, the rule requiring reasonable diligence and promptness, for Blessum's eighteen months delay in filing the QDRO. *Id.* at 585–86.

Collateral estoppel, or issue preclusion, prevents parties in a prior action from relitigating issues raised and resolved in a previous action. *Comes v. Microsoft Corp.*, 709 N.W.2d 114, 117–18 (Iowa 2006). The doctrine can be used in an offensive or defensive manner. *Id.* at 118. An offensive use of the doctrine is when

a stranger to the judgment, ordinarily the plaintiff in the second action, relies upon a former judgment as conclusively establishing in his favor an issue which he must prove as an essential element of his cause of action or claim.

*Id.* (quoting *Hunter v. City of Des Moines*, 300 N.W.2d 121, 123 (Iowa 1981)).

This case involves the offensive use of issue preclusion. Issue preclusion may be invoked if four prerequisites are met:

(1) the issue concluded must be identical; (2) the issue must have been raised and litigated in the prior action; (3) the issue must have been material and relevant to the disposition of the prior action; and (4) the determination

made of the issue in the prior action must have been necessary and essential to the resulting judgment.

*Id.* (quoting *Hunter*, 300 N.W.2d at 123). Offensive use of issue preclusion requires two additional considerations:

> (1) whether the opposing party in the earlier action was afforded a full and fair opportunity to litigate the issues . . . , and (2) whether any other circumstances are present that would justify granting the party resisting issue preclusion occasion to relitigate the issues.

*Winger v. CM Holdings, L.L.C.*, 881 N.W.2d 433, 451 (Iowa 2016) (quoting *Emp'rs Mut. Cas. Co. v. Van Haaften*, 815 N.W.2d 17, 22 (Iowa 2012)). "Although offensive use of issue preclusion is allowed in Iowa[,] . . . it is more restrictively and cautiously applied than defensive issue preclusion." *Id.* (alteration in original) (quoting *Gardner v. Hartford Ins. Accident & Indemn. Co.*, 659 N.W.2d 198, 203 (Iowa 2003)). "The ultimate final judgment need not be on the specific issue to be given preclusive effect." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stowers*, 823 N.W.2d 1, 8 (Iowa 2012). However, it must be "firm and considered" or "resolved." *Id.*; *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Rhinehart*, 827 N.W.2d 169, 179 (Iowa 2013).

The Restatement (Second) of the Law on Judgments lays out a balancing test for determining which issues are precluded by a former judgment:

> When there is a lack of total identity between the particular matter presented in the second action and that presented in the first, there are several factors that should be considered in deciding whether for purposes of the rule of this Section the "issue" in the two proceedings is the same, for example: Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first? Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding? Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought

to be presented in the second? How closely related are the claims involved in the two proceedings?

Restatement (Second) of the Law on Judgments § 27 cmt. *c*, at 252 (Am. Law Inst. (1982)).

The first factor that must be met is that the issues are identical. *Comes*, 709 N.W.2d at 118. In Blessum's disciplinary case, we found that he violated three rules: a sexual relationship with a client in violation of rule 32:1.8(j), a criminal act that adversely reflected his fitness to practice law in violation of rule 32:8.4(b), and mishandling a trust account in violation of rule 32:1.15(c). *Blessum*, 861 N.W.2d at 588–91. In this action, the claims Stender submitted to the jury were two legal malpractice claims for Blessum's representation of her in her divorce and her potential claim against her ex-husband, assault and battery by Blessum, and punitive damages. The only similar claims are the commission of a criminal act adversely reflecting on Blessum's fitness to practice law and the claim for assault and battery. Here, the district court precluded Blessum from relitigating the facts necessary to establish that he committed a criminal act.[11] However, the remaining nine issues Stender sought to preclude are not elements of the crime of assault causing bodily injury, the underlying crime Blessum pled guilty to and which adversely reflected on his fitness to practice law.[12]

Similarly, the remaining nine issues were neither "material and relevant to the disposition" nor "necessary and essential to the resulting judgment." *Comes*, 709 N.W.2d at 118. In Blessum's disciplinary case,

---

[11]The district court precluded Blessum from relitigating (1) that he struck Stender on June 11, 2012; (2) that the strike was intentional; (3) that the resulting contact was insulting and offensive; (4) that the strike caused Stender to suffer a bodily injury; and (5) that he did not act in self-defense.

[12]Blessum pled guilty to assault causing injury in violation of Iowa Code sections 708.1(1) and 708.2(2).

the facts necessary to establish a violation of rule 32:1.8(j) were that a sexual relationship existed and that it existed during Blessum's representation of Stender. *Blessum*, 861 N.W.2d at 587–88. To find a violation of rule 32:8.4(b), the facts necessary were that Blessum committed a criminal act and that said criminal act reflected adversely on his honesty, trustworthiness, or fitness as a lawyer. *Id.* at 588. The nine issues Stender sought to preclude Blessum from relitigating were secondary to the facts necessary to establish the rule violations in his disciplinary case.

We agree with the decision of the district court that those nine issues were not precluded. We find no abuse of discretion.

**D. Medical Records.** The district court allowed the introduction of Stender's medical records to the extent they were relevant, without requiring expert testimony. Before trial, Stender filed a motion in limine requesting that the court only allow her medical records to be explained by expert testimony, but not sent to the jury during deliberations. During trial, hundreds of pages of medical records were introduced, including general practice healthcare records, mental health and counseling records, chiropractor visit records, vision records, and physiotherapy records. The court allowed the documents to be admitted to the jury during deliberations, but redacted those portions of the medical records that were not relevant or otherwise inadmissible. Stender argues the redactions were not sufficient because they allowed the jury to guess at the terms used and read unsupported conclusions about her condition.

The Iowa Code provides a patient-litigant exception to the statutory patient–physician privilege. Iowa Code § 622.10(2). It states,

> The prohibition does not apply to . . . mental health professionals . . . in a civil action in which the condition of the person in whose favor the prohibition is made is an element or factor of the claim or defense of the person or of any party claiming through or under the person. The evidence is admissible upon trial of the action only as it relates to the condition alleged.

*Id.* If this exception applies, the information to which it applies is no longer protected as privileged. *Id.*; *see also Fagen v. Grand View Univ.*, 861 N.W.2d 825, 836 (Iowa 2015). The purpose of this exception does not frustrate the underlying purpose for patient–physician privilege. *Fagen*, 861 N.W.2d at 832. This is because the patient still knows that his or her statements to mental health providers "remain confidential unless he [or she] affirmatively and voluntarily chooses to reveal them" by raising the medical condition as a claim or defense. *Id.* (quoting *Chung v. Legacy Corp.*, 548 N.W.2d 147, 151 (Iowa 1996)).

However, the statute does not waive the patient's privilege to all of their mental health records. *Id.* There are two competing interests the court must weigh when considering whether to admit medical records: the patient's right to privacy in his or her own mental health records, and the defendant's right to present a full and fair defense to the plaintiff's claims. *Id.* Because of this balancing, one of the circumstances in which a patient may waive the right to privacy of mental health records is when the patient makes the "condition . . . an element or factor of the claim or defense." *Id.* at 833 (quoting Iowa Code § 622.10(2)).

Stender's claims voluntarily raised her medical condition in the litigation. For example, in her original petition, Stender raised a claim for intentional infliction of emotional distress. Although she later dismissed this claim, the jury was instructed on the following elements of damage on her claims: past medical expenses, past physical and mental

pain and suffering, past loss of use of the full mind and body, future medical expenses, future physical and mental pain and suffering, and future loss of use of the full mind and body. Each of the elements of damage is based on issues involving Stender's medical conditions, both mental and physical. The jury was also instructed on her claim for punitive damages in connection with the assault and battery. Clearly, the entire spectrum of Stender's medical conditions was relevant to the jury in its consideration of the award of damages and punitive damages in this case.

We agree with the decision of the district court that Stender's medical records were related to her claims and were properly submitted to the jury for its consideration. The district court redacted portions of the records that were not relevant or admissible before admitting them to the jury during deliberations. While Stender claims the records were not redacted enough and some of them should not have been given to the jury at all, the district court properly weighed Stender's right to privacy in her medical records with Blessum's right to present a full and fair defense to her claims involving her medical conditions. We find no abuse of discretion by the district court.

**E. Jan Blessum's Testimony.** Stender argues that the testimony of Jan Blessum, Blessum's estranged wife, should have been excluded because it was highly prejudicial and this prejudice substantially outweighed any probative value.

Stender testified that Blessum and his wife separated in August or September 2011. She also testified that during the course of their relationship, Blessum and his wife attempted to reconcile, but Blessum told her the attempts failed. Stender testified that she would "let Zane and Jan try to work it out" and that she "never wanted to discourage

them from being together" because she "thought it would be good if they would get back together." It was only after Stender testified to these matters that Blessum requested Jan Blessum testify to contradict this testimony.

Jan testified that Stender's version of events was in contrast to her own experience. The testimony was offered to rebut Stender's testimony that she encouraged Blessum to get back together with Jan. Jan testified that she felt the sexual relationship between Stender and Blessum adversely affected her marriage. Jan testified that Stender harassed her with nasty text messages and emails. She testified about sexually graphic emails and text messages that Stender sent to her. Jan testified that this contact impacted her job and her health and that she lost thirty pounds. Jan moved four times in 2011 and 2012.

Jan also testified that she believed Stender broke into her home on February 14, 2012. Jan testified she and Blessum were attempting to reconcile again around that time. Because their engagement anniversary was February 13, Blessum came to her home and left flowers and a Valentine's Day card. The next day when Jan returned home, she found a card from Blessum to Stender torn up on the counter next to her own card with a sign that read "fuck you" next to it.

Jan testified her housekeeper found Stender in Jan's house in June 2012. Jan was supposed to go to a concert with Blessum that week, but chose not to attend after Stender was found in her house. While Blessum was at the concert, Stender sent Jan text messages stating that Stender was in the shower with Blessum and that Jan did not know how to sexually please her husband and needed Stender to show her. Jan also testified that Stender would send her daughter Facebook messages. Jan testified that she attempted to obtain a

restraining order against Stender because of the emails and text messages, but was unsuccessful.

Stender argues that Jan's testimony was unduly prejudicial because it painted Stender in a negative light to the jury. The district court allowed the testimony because Jan was able to directly address Stender's testimony and because it was relevant to Stender's claims for punitive damages.

"The court may exclude evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ." Iowa R. Evid. 5.403. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence." Iowa R. Evid. 5.401; *see also Mercer v. Pittway Corp.,* 616 N.W.2d 602, 612 (Iowa 2000). "Unfair prejudice arises when the evidence prompts the jury to make a decision on an improper basis." *Mercer,* 616 N.W.2d at 612 (quoting *Waits v. United Fire & Cas. Co.,* 572 N.W.2d 565, 569 (Iowa 1997)). However, not all erroneously admitted evidence requires reversal. *Id.* "Although a presumption of prejudice arises when the district court has received irrelevant evidence over a proper objection, the presumption is not sufficient to require reversal if the record shows a lack of prejudice." *Id.* (quoting *McClure v. Walgreen Co.,* 613 N.W.2d 225, 235 (Iowa 2000)).

Jan's testimony was relevant because it directly addressed Stender's own contentions about the nature of her relationship with Blessum. It was also relevant to the jury in its determination of damages and punitive damages. While Jan's testimony certainly painted Stender in a negative light, the record demonstrates a lack of prejudice. The jury returned a substantial verdict that included $100,000 in punitive

damages. There was no abuse of discretion by the district court in allowing the testimony of Jan Blessum to rebut the testimony of Stender.

### V. Cross-Appeal on Damages.

Blessum filed a cross-appeal arguing for a new trial on the issue of damages relating to the claim for assault and battery and the claim for punitive damages. He claims he was unable to make a motion for a new trial or a motion for judgment notwithstanding the verdict at the district court level because Stender filed her notice of appeal before he had an opportunity to do so.

A notice for appeal from a final order or judgment must be filed within thirty days after the final order or judgment. Iowa R. App. P. 6.101(*b*). A motion for a new trial or a motion for judgment notwithstanding the verdict must be filed within fifteen days after the verdict. Iowa R. Civ. P. 1.1007. We can remand a pending appeal to the district court, but the litigant is required to file a motion for remand—in this case to file a motion for a new trial—"as soon as the grounds for the motion become apparent." Iowa R. App. P. 6.1004.

Here, Stender filed her notice of appeal on November 25, 2015. Blessum did not file a motion for remand until June 30, 2016, more than seven months after he was aware of the notice of appeal. Blessum then filed his brief, which contained his argument on cross-appeal for a new trial. We find that Blessum's motion and cross-appeal were both untimely.

In any event, we reject on the merits Blessum's challenge to the amount of the jury award. "[T]he amount of an award is primarily a jury question, and courts should not interfere with an award when it is within a reasonable range of the evidence." *Smith v. Iowa State Univ.*, 851 N.W.2d 1, 31 (Iowa 2014) (alteration in original) (quoting *Jasper v.*

*H. Nizam, Inc.*, 764 N.W.2d 751, 772 (Iowa 2009)). The jury's assessment of damages "should be disturbed only for the most compelling reasons." *Rees v. O'Malley*, 461 N.W.2d 833, 839 (Iowa 1990) (quoting *Olsen v. Drahos*, 229 N.W.2d 741, 742 (Iowa 1975)). "[W]e view the evidence in the light most favorable to the verdict . . . ." *Id.* (quoting *Olsen*, 229 N.W.2d at 742). The award of actual damages and punitive damages in this case did not exceed the range permitted by the evidence.

## VI. Conclusion.

For the foregoing reasons, we affirm the judgment of the district court as well as each of the evidentiary rulings of the district court. We conclude that Blessum's motion for a new trial on the issue of damages, and the cross-appeal, were untimely. However, even if we consider Blessum's challenge to the award of damages and punitive damages on the merits, we find no error.

**AFFIRMED.**

All justices concur except Hecht, Wiggins, and Appel, JJ., who dissent.

#15–2016, *Stender v. Blessum*

**HECHT, Justice (dissenting).**

Because I believe the district court erred in directing a verdict on two of Melissa Stender's theories of liability, I respectfully dissent.

As the majority has correctly observed, we review the evidence in the light most favorable to a party resisting a motion for directed verdict. *See Dettmann v. Kruckenberg*, 613 N.W.2d 238, 250–51 (Iowa 2000). We review the district court's ruling to determine whether Stender presented substantial evidence on each element of her claims. *See Gibson v. ITT Hartford Ins.*, 621 N.W.2d 388, 391 (Iowa 2001). "Evidence is substantial if a jury could reasonably infer a fact from the evidence." *Balmer v. Hawkeye Steel*, 604 N.W.2d 639, 641 (Iowa 2000). Applying these principles, I conclude the district court erred in failing to submit to the jury Stender's claim that Anthony Zane Blessum was negligent in his representation of her in connection with the will. For reasons explained below, I also conclude Blessum's fiduciary-duty theory should have been submitted to the jury.

## I. The Negligence Claim.

The majority affirms the directed verdict on Stender's claim that Blessum was negligent in engaging in a sexual relationship with her while representing her in connection with a will on two grounds. First, my colleagues in the majority conclude Blessum owed no actionable duty to avoid a sexual relationship with Stender while representing her. Second, they conclude the negligence claim was properly withheld from the jury because Stender offered "no evidence of any actual injury, loss, or damage . . . separate from the damages resulting from the assault."

**A. Duty to Avoid a Sexual Relationship.** The subject of sexual relationships between lawyers and their clients is addressed in rule

32:1.8(j) of the Iowa Rules of Professional Conduct for lawyers. In relevant part, that rule provides,

> A lawyer shall not have sexual relations with a client, or a representative of a client, unless the person is the spouse of the lawyer or the sexual relationship predates the initiation of the client-lawyer relationship.

Comment 17 to rule 32:1.8(j) explains the rationale for prohibiting sexual relationships between lawyers and their clients and provides additional context:

> The relationship between lawyer and client is a fiduciary one in which the lawyer occupies the highest position of trust and confidence. *The relationship is almost always unequal; thus a sexual relationship between lawyer and client can involve unfair exploitation of the lawyer's fiduciary role*, in violation of the lawyer's basic ethical obligation not to use the trust of the client to the client's disadvantage. In addition, such a relationship presents a significant danger that, *because of the lawyer's emotional involvement, the lawyer will be unable to represent the client without impairment of the exercise of independent professional judgment.* Moreover, a blurred line between the professional and personal relationships may make it difficult to predict to what extent client confidences will be protected by the attorney-client evidentiary privilege, since client confidences are protected by privilege only when they are imparted in the context of the client-lawyer relationship. *Because of the significant danger of harm to client interests and because the client's own emotional involvement renders it unlikely that the client could give adequate informed consent, this rule prohibits the lawyer from having sexual relations with a client regardless of whether the relationship is consensual* and regardless of the absence of prejudice to the client.

(Emphases added.) Thus, to protect clients from exploitation, lawyer's professional judgment, and confidences and evidentiary privileges accordant to the fiduciary relationship, the rule prohibits most sexual relationships between lawyers and clients, regardless of actual prejudice or consent.

A lawyer's duty to avoid sexual relationships with clients arises because such relationships create obvious and inherent risks of financial

and emotional injuries to clients.[13] A power imbalance between lawyers and their clients—often arising from clients' vulnerable personal and financial positions—tends to significantly undermine the consensual aspects of sexual relationships between them. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Marzen*, 779 N.W.2d 757, 760 (Iowa 2010) (applying the principle that the professional relationship between a lawyer and a client makes the client's "consent" to a sexual relationship with the attorney impossible in the context of an attorney–client relationship); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hill*, 540 N.W.2d 43, 44 (Iowa 1995) (identifying the unequal balance of power between an attorney and a client as the reason for the rule prohibiting sexual relationships between them). A sexual relationship with a client jeopardizes the lawyer's loyalty and independent judgment, which are essential features of the lawyer–client relationship. Iowa R. Prof'l Conduct 32:1.7 cmt. 1 ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client."). Put simply, sexual relationships between lawyers and their clients are fraught with risk of financial and emotional injuries to clients. Because the risk of such injuries to clients is so grave, the rules of professional conduct for lawyers do not merely recommend avoidance of sexual relationships with clients—the rules categorically prohibit the commencement of such relationships during a lawyer–client professional relationship. Blessum clearly breached his professional duty to avoid a sexual relationship with Stender.

---

[13]As the text of the rule suggests, the rule does not establish a categorical prohibition of sexual relationships between lawyers and clients. When a sexual relationship predates the lawyer–client relationship or occurs within a marital relationship, the rule does not forbid the relationship.

The majority acknowledges Blessum breached an ethical duty under rule 32:1.8(j) by engaging in the sexual relationship with Stender but concludes the breach was of no legal consequence in this case. Perceiving no connection between the sexual relationship and a breach of some other professional duty owed by Blessum to Stender (e.g., negligence in preparing a defective will), the majority affirms the directed verdict. Applying the principles that limit our standard of review in this case, I come to a different conclusion.

I find substantial evidence in the record tending to establish a sufficient nexus between the sexual relationship and the legal services provided by Blessum. Stender presented evidence supporting a finding that Blessum reinitiated the lawyer–client relationship by wrongfully advising her that she needed a will to assure her property would be inherited by her children. She also offered expert testimony suggesting Blessum's legal advice on this point was inaccurate because her property would pass to her children even if she died intestate. During trial, Stender repeatedly pressed her theory of the required nexus between the lawyer–client relationship and Blessum's sexual misconduct: Blessum gave the inaccurate legal advice as a pretext for reestablishing the lawyer–client relationship in furtherance of an improper personal relationship. When I view the record, as I must, in the light most favorable to Stender, I find she presented sufficient evidence to engender a fact question on her claim of a nexus between Blessum's conduct in reestablishing the lawyer–client relationship for the purported purpose of drawing an unnecessary will and the ensuing improper sexual relationship. This nexus is analogous to the one supporting a civil action against an attorney who provides legal services on the condition that the client engage in sexual activity. *See Suppressed v. Suppressed,* 565

N.E.2d 101, 105 (Ill. App. Ct. 1990) (acknowledging rule that breach of lawyer's duty prohibiting sexual relationship is actionable if professional services are contingent upon the client's participation in a sexual relationship).

I would reject the majority's no-duty rule under the circumstances of this case for other important reasons. First, rule 32:1.8(j) establishes a clear standard of conduct for lawyers. The majority correctly notes that the scope to our rules of professional conduct cautions that the rules of professional conduct are not designed to be a basis for civil liability. *See* Iowa R. Prof'l Conduct ch. 32 Preamble & Scope [20]. Yet, since the rules "do establish standards of conduct by lawyers, a lawyer's violation of a rule may be evidence of breach of the applicable standard of conduct." *Id.* I believe rule 32:1.8(j) establishes a standard of conduct—a bright-line rule—clearly violated in this case by Blessum. The district court erred in excluding evidence of this standard and expert testimony opining that the standard was breached and also erred in directing a verdict in Blessum's favor on this theory of negligence.

Second, I would hew closely to the principle that no-duty rules should be reserved for "exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases." Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 7(b), at 77 (Am. Law Inst. 2010). I can conceive of no principle or policy justifying a no-duty rule for lawyers engaging in sexual relationships with their clients, especially in cases like this where evidence tends to show the lawyer knew of the client's particular vulnerabilities.

In my view, policy considerations point decisively in favor of the recognition of a duty in this case. The risks of client injury attending

such relationships are deemed sufficiently grave to justify severe sanctions under our rules regulating professional conduct. *See, e.g.*, *Marzen*, 779 N.W.2d at 769 (suspending attorney's license for at least six months); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Furlong*, 625 N.W.2d 711, 714 (Iowa 2001) (suspending license for at least eighteen months); *Hill*, 540 N.W.2d at 45 (suspending license for at least twelve months). Yet despite disciplinary sanctions imposed by this court against attorneys engaging in improper conduct of this type, the prohibited relationships persist, suggesting such sanctions do not adequately deter the wrongful conduct. A civil damage remedy is justified—indeed, required, in my view—by a policy favoring protection of confidential, fiduciary, and privileged lawyer–client relationships and a policy of deterrence against sexual misconduct that is destructive of such relationships. The majority's no-duty rule undermines these important policies, especially in this case where Stender advanced a plausible nexus between Blessum's purpose for reestablishing the lawyer–client relationship and his improper sexual conduct.

**B. Damages Caused by the Sexual Relationship.** Although rule 32:1.8(j) establishes a clear standard of conduct for lawyers, a civil action for its breach requires proof that the sexual relationship caused damages. I dissent from the majority's conclusion that the directed verdict on the negligence claim was justified for lack of substantial evidence of damages caused by Blessum's breach of the duty to avoid a sexual relationship with Stender. The district court acknowledged that Stender presented substantial evidence of severe physical and emotional injuries resulting from the assault and battery. Ignoring that comment 17 to rule 32:1.8(j) instructs that "the client's own emotional involvement renders it unlikely that the client could give adequate informed consent,"

the district court found that Stender consented to other aspects of the sexual relationship and thus, as a matter of law, suffered no compensable emotional injury from the sexual relationship beyond that for which she could be compensated under the assault and battery theory.[14]  *But see Marzen*, 779 N.W.2d at 760 (concluding a client's consent does not excuse a lawyer's sexual relationship with a client). The majority affirms on this issue, finding "no evidence of any actual injury, loss, or damage . . . separate from the damages resulting from the assault."  I disagree.

Again viewing the record in the light most favorable to Stender, I credit the substantial evidence tending to establish that even before Stender was severely beaten by Blessum, the relationship between the parties was tumultuous and marked by great emotional turmoil.  A reasonable jury could find on this record that Stender was exquisitely vulnerable to emotional injury because she had an unfortunate preexisting history of sexual abuse and posttraumatic stress—a history of which Blessum was aware when he commenced the sexual relationship.  I find substantial evidence in the record tending to prove Blessum expressly used his knowledge of that history in asserting power over Stender during the assault and that Stender suffered substantial emotional distress as a consequence of the sexual relationship before and after the severe beating.  Accordingly, under the applicable standards of review, I believe the district court erred in concluding

---

[14]In refusing to submit Stender's negligence theory, the district court observed that any emotional distress suffered by Stender solely because of the sexual relationship (and apart from the distress caused by the beating) would not have been compensable if she and Blessum had not been in a lawyer–client relationship.  But, of course, the prohibited sexual relationship between the parties in this case occurred within their lawyer–client relationship.

Stender failed to engender a jury question on damages arising from Blessum's breach of duty.

## II. The Fiduciary-Duty Claim.

The majority affirms the directed verdict on Stender's breach of duty claim on the ground that "a sexual relationship alone cannot be the basis for a breach of fiduciary duty or legal malpractice claim, absent some link between the sexual relationship and a wrong committed in the scope of the legal representation." The rationale offered for a no-duty rule in this context is that "sexual intercourse between two consenting adults is not, of itself, actionable conduct." *Kling v. Landry*, 686 N.E.2d 33, 40 (Ill. App. Ct. 1997). But consent is an odd justification for the majority's adoption of the rule because we have previously concluded— consistent with comment 17 to rule 32:1.8(j)—that a lawyer's duty to avoid a sexual relationship with a client is not vitiated by the client's consent. *Marzen*, 779 N.W.2d at 760.

As the majority has noted, a lawyer owes a client a fiduciary duty precluding the lawyer's employment of powers arising from the lawyer–client relationship in a manner adverse to the client's interest. *See* Restatement (Third) of the Law Governing Lawyers § 49 cmt. *b*, at 348 (Am. Law Inst. 2000). A reasonable juror could credit Stender's testimony that Blessum threatened Stender during the beating, as he attempted to coerce her into having sex, by saying that if she thought the "other men have hurt [her], . . . just wait and see what [he] do[es] to [her]." Blessum learned this information during the course of the lawyer–client relationship. His threat thus constitutes substantial evidence that Blessum employed—to Stender's disadvantage— information about her past that she revealed to him during the course of

the confidential lawyer–client relationship, thus breaching his fiduciary duty.

Viewing the evidence and reasonable inferences in the light most favorable to Stender, I also conclude reasonable inferences from the evidence tend to support her theory that Blessum did not deal with her honestly when he reinitiated the lawyer–client relationship based upon the false representation that she needed a will to assure her children would inherit her property. On this basis, too, I conclude substantial evidence supported a finding that Blessum engaged in dishonesty and thereby violated his fiduciary duty to Stender.

Because a reasonable juror could find that Blessum used information he acquired within the scope of the lawyer–client relationship to Stender's disadvantage during the assault and that Blessum dishonestly reinitiated the lawyer–client relationship as a pretext for beginning a sexual relationship, the theory of liability based on a breach of a fiduciary duty should have been submitted to the jury.

**III. Conclusion.**

For the reasons I have expressed, I find merit in Stender's appeal. I would reverse the directed verdict on both the negligence and fiduciary-duty issues and remand for a new trial.

Wiggins and Appel, JJ., join this dissent.